Charles H. DAVEY et al., Plaintiffs,

v.

Frank E. FITZSIMMONS et al., Defendants,

and

Trucking Employers, Inc., Defendant-Intervenor.

Civ. A. No. 76-638.

United States District Court, District of Columbia.

April 22, 1976.

Kenneth J. Yablonski, Washington, Pa., Harry Huge, Thomas Nurmi, Edward J. Spriggs, Arthur Fox, Washington, D. C., for plaintiffs.

David Previant, Milwaukee, Wis., Robert M. Baptiste, Roland P. Wilder, Jr., Washington, D. C., for defendants.

Thomas K. Wotring, Washington, D. C., Raymond F. Beagle, Kansas City, Mo., James A. Matthews, Jr., Philadelphia, Pa., Michael Gallagher, Kansas City, Mo., for defendant-intervenor.

## MEMORANDUM OPINION

BRYANT, District Judge.

This matter is now before the Court on plaintiffs' Motion For Preliminary Injunction and defendants' Motion To Dismiss, and the respective oppositions thereto. The action was transferred to this Court from the United States District Court For The Western District of Pennsylvania, where it was originally filed. A temporary restraining order was entered by the Honorable

Joseph C. Waddy of this Court on April 16, 1976, enjoining the defendants from initiating the challenged procedure pending a hearing on the motion for preliminary injunction. That hearing was held on April 20, 1976, at which time Trucking Employers, Inc. was permitted to intervene in the case as a party defendant under Rule 24(a), F.R.C.P. The temporary restraining order was also extended at that hearing, to remain in effect until further order of the Court. For the reasons outlined below, the Court denies plaintiffs' motion and grants defendants' motion, dismissing the case.

Plaintiffs, members of various local unions of the International Brotherhood of Teamsters, seek in this action to prevent the defendant international union (hereafter "Teamsters") from conducting a ratification vote on the newly-negotiated contract with the trucking industry covering the period 1976–1979. Under the ratification procedure currently contemplated, the union will mail ballots (which mailing is currently enjoined) to each member of a "freight" local (i. e. employees of companies with freight operations and therefore covered by the new agreement.) The ballots allow members to vote either yes or no, and are tallied on a cumulative national basis; the contract is approved if over fifty percent of those voting nationwide cast "yes" ballots. The plaintiffs object to this ratification procedure because, they claim, the contract itself is not a truly national contract, but rather a national agreement and some thirty-two independent supplemental agreements, each covering a separate geographic area. Plaintiffs allege that according to the union constitution and federal law they have the right therefore to ratify the supplemental area agreement covering them independently of the national, uniform portion of the contract, and ask the Court to enforce that right by way of declaratory and injunctive relief.

Plaintiffs' legal attack is three-pronged. First, they assert that under section 101(a) of the Labor Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act), 29 U.S.C. § 411(a)(1), they are being denied equality in voting rights and are being discriminated against because they cannot separately vote on the national and local portions of the contract. This claim is based on their interpretation of the union constitution and on their rights under the Act itself. Secondly, they allege that defendant Fitzsimmons is violating his fiduciary duties under section 501(a) of the Act, 29 U.S.C. § 501(a), by failing to accord them the political right of separate ratification which they claim is compelled by the union constitution. Finally, plaintiffs claim defendants have breached their contractual obligations to permit the separate ratification guaranteed by the union constitution, in violation of section 9(a) of the National Labor Relations Act, 29 U.S.C. § 158(a), for which plaintiffs seek relief under section 301(a) of that Act, 29 U.S.C. § 185(a). Defendants contest all of plaintiffs' claims and have moved to dismiss the action pursuant to Rule 12(b)(1) and (6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

## I. The Section 101 Claims

On April 3, 1976, following a three-day nationwide strike by the Teamsters against the trucking industry, and as a result of successful personal mediation by the Secretary of Labor, the two groups reached a tentative settlement and agreement on a new "National Master Freight Agreement" for the three years commencing on April 1, 1976. It is the proper characterization of that agreement as it relates to the union constitution that is the principal issue in this case. Article XVI of the Teamsters' constitution provides in relevant part as follows:

> Area, Multi-Area or National, Company-wide or Industry-wide Contracts
>
> Section 4(a). If a majority of the affiliated Local Unions vote for area, multi-area or national, company-wide or industry-wide negotiations for an area, national, company-wide or industry-wide contract, all involved affiliated Local Unions shall be bound by such vote, must participate in such area, multi-area or national,

company-wide or industry-wide bargaining and shall be bound by the contract approved as provided below. Upon completion of negotiations by a conference, Trade Division, or by any Committee appointed by the General President, subject to the approval of the General Executive Board, to engage in negotiation of an industry, area, multi-area or national or company-wide contract, such contract shall be submitted to the membership covered by said contract proposal for their approval or rejection.

If a majority of the votes cast by Local Union members voting approve such contract it shall become binding and effective upon all Local Unions involved and their members.

* * * * * *

(b) * * *

The General President, subject to the approval of the General Executive Board, shall have the authority to appoint negotiating committees and establish procedures for the negotiation of area, multi-area or national, company-wide and industry-wide agreements and for the submission of such negotiated agreements to the membership covered by the proposed contract for approval or rejection, and to do all things necessary to implement the enforcement of such agreements and compliance by Local Unions with the provisions of this Article and the procedures established thereunder.

Such negotiating committees shall have the authority, with the approval of the General Executive Board, to conduct contract ratification votes and strike votes on such area, multi-area or national, company-wide, industry-wide, or Local Union basis as the committee shall determine, and in the event the strike is authorized, the said committee shall have the authority, with the approval of the General Executive Board, to direct that the strike be conducted on such area, multi-area or national, company-wide, industry-wide, Local Union or such other selective basis as the committee shall determine; provided, however, that the results of ratification or rejection votes with respect to national agreements shall be determined on a cumulative basis of all votes cast by all affected voting members in all areas,

. . . .

* * * * * *

This Article shall be broadly interpreted to carry out the intent and purpose of permitting national negotiations and national agreements in any industry in which the International Brotherhood of Teamsters has jurisdiction.

* * * * * *

Section 6. The General Executive Board is empowered to amend, delete or add to Article XVI if at any time it believes such action will be in the interest of the International Union or its subordinate bodies.

The National Master Freight Agreement consists of an overall national agreement dealing primarily with economic issues and thirty-two area supplements dealing primarily with other terms and conditions of employment, such as seniority and local grievance procedures. The question at issue here is whether the Master agreement is to be regarded as a single contract for purposes of submission to the "membership covered by said contract for their approval or rejection" [Art. XVI, Sec. 4(a)], or whether each area supplement also constitutes such a contract and must therefore be submitted for independent ratification or rejection. In resolving this issue, the Court is guided by two related principles: first, that courts will accept the correctness of an interpretation fairly placed on union rules by a union's authorized officials, *English v. Cunningham,* 108 U.S.App. D.C. 365, 282 F.2d 848 (1960), and second, that the court should conduct such an analysis in light of the history, purposes, and context of the document involved, cf. *Sabolsky v. Budzanoski,* 457 F.2d 1245, 1252 (C.A.3, 1972), *cert. denied,* 409 U.S. 853, 93 S.Ct. 65, 34 L.Ed.2d 96. When these principles are applied to the instant case, it is clear that the National Master Freight Agreement (including area supplements) is

a single contract within the meaning of the Teamster constitution, and that the constitution requires that it be ratified by a single cumulative national vote of union members.

National bargaining in the trucking industry developed through an evolutionary process in which technological improvements and other pressures on employees and their employers forced a transition from Local Union jurisdictional bargaining to area, multi-area and finally nationwide bargaining in 1964. (IBT Exhs. 2, ¶¶ 2–4; 10) * From its inception in the 1930's, the evolutionary process took approximately thirty years. (IBT Exh. 10) The principal strides in the transition were made during the years 1955–1964 (IBT Exh. 2, ¶ 4) when uniform contract language was included in important area agreements in preparation for truly national bargaining in 1964.

At the International Union's 1961 Convention, its constitution was amended to provide for compulsory participation by Local Unions in area bargaining and contracts "if a majority of the affiliated Local Unions vote for area negotiations for an area contract . . . ." (IBT Exh. 5, at 90) The amendment further provided:

Upon completion of negotiations by an Area Conference of an industry, area or company-wide contract such contract shall be submitted to the membership covered by said contract proposal for their approval or rejection.

If a majority of the votes cast by Local Union members voting approve such contract it shall become binding and effective upon all Local Unions involved and their members.

This policy was not without its detractors, who argued that it tended to encroach on the autonomy of Local Unions. (IBT Exh. 7, at 616) During the floor debate, it was made clear that Local Union supplemental riders would become subject to approval by the Area Negotiating Committee (IBT Exh. 4, at 609), and "that in the future a majority of the members involved [and voting], regardless of the number of Locals,

will accept or reject." (IBT Exh. 4, at 611) Two safeguards were incorporated into the constitution: First, Local Unions were assured that their members would suffer no economic loss, and, second, an appeal was provided to the International's General Executive Board in the event a Local Union believed that a superior working condition would be lost under an area contract. Of particular importance was the broad authority vested in the Board:

The General Executive Board is authorized to amend, delete or add to Article XVI if at any time it believes such action will be in the interest of the International Union or its subordinate bodies. [IBT Exh. 5, at 92.]

At its August 28, 1963 meeting, the General Executive Board officially interpreted Article XVI, Section 4 of the International Constitution as being applicable to multi-employer, multi-union national contracts. (IBT Exh. 6) This interpretation was made in light of Article XVI, Section 4(b)'s express language making all provisions of Article XVI, Section 4 "equally applicable" to contracts on a "multi-area basis." (IBT Exh. 5 at 92) The General Executive Board's resolution called for the creation of a "National-Over-the-Road and City Cartage Policy and Negotiating Committee" to negotiate such contracts and hold ratification votes thereon, the results of which "shall be determined on a cumulative basis of all votes cast by all affected members in all areas . . . " (IBT Exh. 6, at 18–19)

In connection with this resolution, delegates from all freight locals met in Washington, D. C. on August 23, 1963, and themselves adopted a resolution establishing policy and procedures for negotiation of a National Master Freight Agreement. (IBT Exh. 6, at 11–15) Like the General Executive Board's resolution, it called for the creation of a National Negotiating Committee "which shall be authorized to draft proposals for, and conduct the negotiations of, a National Over-the-Road and a National Cartage Agreement and necessary supple-

---

* The phrase "IBT Exh." refers to the set of exhibits filed by defendants on April 19, 1976.

ments and contracts affecting the Trucking Industry . . .." It further provided, *inter alia,* for approval of the proposed, negotiated contracts by a majority vote of Local Union representatives, and thereafter the submission of the tentative agreement "for approval by a cumulative majority of the Local Union members of all conferences affected, as is provided in the International Constitution as interpreted and applied by the International President and the General Executive Board."

In September, 1963, the International Union directed its freight locals to conduct a membership vote to determine whether the members were in favor of a national freight agreement. (IBT Exh. 2, ¶ 10) The vote in favor of national bargaining was overwhelming. Accordingly, Local Unions executed powers of attorney (IBT Exh. 6, at 16–17) authorizing the National Negotiating Committee to negotiate a national freight contract on their behalf, together with supplements and addenda thereto.

In accordance with its authority under Article XVI, Section 5 of the 1961 International Constitution (IBT Ex. 5, at 92), the General Executive Board enacted a resolution amending Article XVI, Section 4 expressly to cover "national" agreements. (IBT Exh. 6, at 4–10) The National Negotiating Committee negotiated a National Master Freight Agreement and thirty-eight supplements for the February 1, 1964 to March 31, 1967 period. The bargaining unit covered by the national agreement was comprised of approximately 305,000 employees employed by some 9,800 employers across the nation. An overwhelming majority of voting members covered by the agreement and supplements voted for ratification. The vote was conducted in Local Union referenda and tallied on a cumulative basis. (IBT Exh. 2, ¶ 12)

The resolutions of the General Executive Board, dated August 28, and December 2, 1963, pursuant to which Article XVI, Section 4 was amended, were ratified at the International Union's Eighteenth Convention in July, 1966. The delegates voted to physically incorporate the amendments into the 1966 constitution, and adopted the constitution as so amended. (IBT Exhs. 7, at 600–01; 8, at 101–04) Proposed amendments, which purported to permit Local Unions to opt out of national bargaining, were decisively defeated.

The National Negotiating Committee negotiated a proposed National Master Freight Agreement, area supplements and the iron and steel riders on behalf of Local Unions in 1967 and 1970. In May, 1967, union members working in the freight industry ratified the proposed agreement, supplements and riders by a 4 to 1 margin. They voted cumulatively on the agreement, supplements and riders in a referendum election conducted by the United States Department of Labor. In July, 1970, the freight membership, again voting cumulatively in a mail referendum supervised by the Labor Department, ratified the National Master Freight Agreement and area supplements thereto for the period 1970–73 by a 2.5 to 1 margin. (IBT Exh. 2, ¶¶ 16, 17) The iron and steel riders to the area supplements, however, were ratified under different procedures due to exceptional circumstances not relevant here.

Article XVI, Section 4 of the International Constitution was amended at the Twentieth Convention in July, 1971. The relevant amendment was to Section 4(a); it provided for approval of Local Union riders by the Area Conference and the National Negotiating Committee before becoming effective. (IBT Exhs. 15, at 393; 16, at 104) After adopting the amendments to Article XVI, Section 4, the Convention adopted the constitution, including amendments and unchanged provisions, in its entirety. (IBT Exh. 15, at 440, 443).

In 1973, the National Negotiating Committee negotiated a proposed National Master Freight Agreement and supplements thereto for the period 1973–76. As in previous years, the Committee conducted a mail referendum vote in which freight local members, voting cumulatively, ratified the agreement and area supplements thereto by a 2.3 to 1 margin.

The National Negotiating Committee is now designated the "Teamsters National Freight Industry Negotiating Committee." It is composed of representatives appointed by the General President upon the recommendation of the Area Conference Directors. "The Committee is charged with the responsibility for negotiating the National Master and all supplemental agreements, dividing itself into subcommittees for the purpose of conducting simultaneous negotiations." (IBT Exh. 2, ¶ 28) The National Committee's principal subcommittee negotiates articles 1–39 of the National Master Freight Agreement and the monetary package, whose benefits are applied uniformly throughout the nation—i. e., to all supplemental areas. (IBT Exhs. 2, ¶ 29; 17) The area subcommittees negotiate the final form of the supplemental agreements at the same time and at the same location. The provisions of the supplements begin at Article 40 of the National Master Freight Agreement. (IBT Exh. 2, ¶ 30) Tentative settlements by all subcommittees are subject to the approval of the National Negotiating Committee. Id. ¶ 30.

The National Committee provides for membership involvement in the negotiating process in several ways. A freight survey of all members working under the National Agreement is conducted prior to the preparation of proposals to ascertain the items considered most important to the membership. (IBT Exh. 19) The freight locals hold meetings of the members before developing proposals for contract amendments which are sent to the National Committee. (IBT Exh. 20) Both the freight survey and Local Union proposals are used by the National Committee in drafting its contract demands. Before submission to the employers, the Committee's draft proposals must be approved by the majority vote of Local Union delegates selected by the membership of each freight local. (IBT Exh. 2, ¶ 32) This year, the meeting took place in Washington, D. C. on November 25, 1975.

Following the November 25th meeting, the Negotiating Committee presented its contract demands to representatives of the employers on December 11, 1975. Bargaining commenced on that date and resumed after holidays in January, 1976, in Washington, D. C.; however, negotiations were soon recessed and recommenced on February 9, 1976, in Arlington Heights, Illinois. They continued with short interruptions from that date until April 7, 1976. At 12:01 A.M. on April 1, 1976, the National Negotiating Committee called the first nationwide strike in the trucking industry to break a deadlock on key items. The strike ended on April 3, 1976, following a tentative settlement with the principal employer groups. (IBT Exh. 2, ¶¶ 33–35)

On April 7, 1976, the National Committee called a meeting attended by two delegates from each of the some 350 freight locals. The tentative agreement to renew the National Master Freight Agreement and all supplements and riders thereto, including the national monetary package, was explained to the delegates. (IBT Exh. 2, ¶ 36) The delegates were informed that the total agreement had been approved by the National Committee and that ratification had been unanimously recommended. (IBT Exh. 1, ¶ 4) The delegates were invited to, and did, question various provisions of the tentative agreement, meeting both on the National Master and, by supplemental area, on the supplements. Thereafter, they approved the total settlement and voted to submit it to ratification or rejection by the membership. (IBT Exh. 2, ¶ 36) The supplements were approved by delegates from Local Unions within each applicable supplemental area.

Plaintiffs do not contend that there are any procedural shortcomings affecting the validity of the various actions of the general executive board or the constitutional conventions; instead they insist that the union has not, despite its intentions to do so, negotiated a national agreement, but has rather negotiated a national contract and thirty-two supplemental area agreements. It is apparent to the Court, however, that plaintiffs' arguments cannot prevail under any view of the facts. As is apparent from the foregoing history relating to Article

XVI, defendants' interpretation of the constitutional provisions relating to negotiation and ratification of freight contracts is not only reasonable, but almost inescapable. From the time the union began to move away from local negotiations in the early 1960's, it was well understood by all concerned that the resulting contracts—although they contained provisions on the terms and conditions of employment which varied from one area to another, in addition to the uniform features applying to all areas—were to be regarded as integrated, unitary agreements, and were to be ratified by cumulative majority vote of all members in the entire area covered by each such integrated contract. When the first National Master Freight Agreement was negotiated in 1964, it was the culmination of the shift away from local contracts and was treated as a national contract by all concerned. Since that time national agreements have been negotiated at each three-year interval, and it has been clearly understood by union members at all levels that these were national negotiations, resulting in national contracts. Indeed, the local unions have explicitly voted to implement and continue this process, as has the general membership of the union in amending its international constitution to facilitate and authorize the process.

In sum, it is clear that the international union, by the action of its members, intended to and did in fact create a national negotiating process, through which a single, national contract is reached, and that the resulting contract—complete with area supplements—was intended, as an integral part of the overall process, to be ratified by a cumulative national vote of the freight membership. The Court concludes therefore, in light of the background, history, and context of the international union's constitutional provision requiring submission "to the membership covered by the proposed contract", that "contract" means (in the case of the national agreement) the National Master Freight Agreement and all area supplements thereto, and the "membership covered" by that contract means all members of the international union entitled to vote on freight contracts of any sort, unless otherwise limited by other parts of the union constitution. See also, *Local 107 v. International Brotherhood of Teamsters,* 65 L.R.R.M. 2265 (D.D.C., 1967).

Plaintiffs contend that even if the constitution authorizes ratification of the Master agreement and supplements as a package, as the Court has concluded that it does, section 101(a) of the LMRDA nevertheless requires separate ratification to ensure equality of voting rights. The Court cannot agree. While package ratification may not represent the most desirable mode of ratification from the point of view of all union members, it neither dilutes the voting power of any individual or group nor discriminates invidiously against any individual or group. Each member has the opportunity to vote to accept or reject a proposed contract according to whatever criteria he or she chooses. Each vote counts the same and has the same effect. A majority of voters can either ratify or reject any Master agreement, and that rejection or ratification falls equally on all members. In short, none of the effects of voting schemes found in other contexts to be illegal is present here. While plaintiffs object to being bound by the area supplement applicable to them merely because a majority of members nationally approve of the package as a whole, this is simply a result of the trade-off that the union, in conformity with its own rules and procedures, has determined to be an acceptable price to be paid in return for the overall benefits of the national negotiating process. And the Court cannot say, as a matter of law, that the union may not make such a choice.

II. The Section 501 Claims

The thrust of plaintiffs' claims under section 501(a) of the LMRDA is that defendant Fitzsimmons, the president of the international union, has violated his fiduciary duties to the members of the union by failing to afford them the opportunity to vote separately on the supplemental and national agreements. Since the Court has determined that the package ratification

procedure is neither unauthorized nor unreasonable, this claim too must fall. Unless there is something clearly and inherently improper about this procedure, which there is not, section 501 can provide plaintiffs with no relief.

III. The NLRA Section 9 Claims

 While these claims are not clearly stated, they may be viewed in either of two frames of reference. Factually, plaintiffs claim that the current structure of the ratification process has the effect of denying them fair representation. Legally, they are either contending that the current utilization of national bargaining, i. e. a national bargaining unit, inherently denies them fair representation, or that defendants deny them fair representation by failing to honor their contractual (constitutional) obligation to allow separate voting on the national and area portions of the Master agreement. In either case, the claims are without merit.

Despite plaintiffs' repeated use of the term "fair representation", they allege no specific denials of fair representation, but rather contend that by negotiating a national agreement with area supplements and ratifying it on a package basis, defendants have the opportunity to and actually do sacrifice the interests of one area more than another in reaching final agreement with the trucking industry. However artful plaintiffs' pleadings, the logical basis of this contention can only amount to a claim that a national bargaining unit is inherently inappropriate for Teamster freight contract bargaining. Since plaintiffs concede that the appropriateness of a bargaining unit is a matter within the exclusive jurisdiction of the National Labor Relations Board, their claim, viewed in this perspective, entitles them to no relief under section 301 of the NLRA.

Viewing plaintiffs' claim as one for failure of the union to honor its constitutionally contracted obligations to them, which plaintiffs again attempt to plead as a fair representation claim, the Court must again conclude that no relief can be granted, in light of its conclusion that the Teamster

constitution creates no such obligation. Accordingly, the case is dismissed pursuant to the Order of April 21, 1976.