454 F.Supp. 813 (1978)
John A. BLACK, Arnold Cherry, Allen Crawford, Walter Humphrey, Victor Laucello, Henry A. Lewis, Jr., Peter R. Lliso, Kathaleen E. McCabe, George L. McDonald, Alonzo Mitchell, Ronald T. Morabito, Roger K. Nichols, Edmund Pinto, Jr., Joseph Ponterella, Jr., Rupert C. Richards, Charles Robbins, Felix G. Robinson, David Rubinstein, Michael Warren, Matthew R. Young, Coalition of Concerned Transit Workers, Committee of Concerned Transit Workers, Revenue Collectors Benevolent Association, Two Hundred Seventh Transit Workers Coalition, Plaintiffs,
v.
TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO, Matthew Guinan, President, Transport Workers Union of Greater New York Local 100, AFL-CIO, John E. Lawe, President, New York City Transit Authority, Harold L. Fisher, Chairman of the Board of Directors and Chief Executive Officer, Defendants.
No. 78 Civ. 3101.
United States District Court, S. D. New York.
July 25, 1978.
*814 *815 Gladstein, Reif & Siegel, James Reif, Amy N. Gladstein, Brooklyn, N. Y., for plaintiffs.
Alphonse E. D'Ambrose, Brooklyn, N. Y., for defendant New York City Transit Authority; Helen R. Cassidy, Walter J. McCarroll, James P. McMahon, Brooklyn, N. Y., of counsel.
O'Donnell & Schwartz, New York City, for defendant Unions; Asher W. Schwartz, Malcolm A. Goldstein, New York City, of counsel.

OPINION
GAGLIARDI, District Judge.
This is an action to restrain the implementation of a collective bargaining agreement covering employees of the defendant New York City Transit Authority ("NYCTA"). The plaintiffs include both individual employees of NYCTA who are members in good standing of defendant Transport Workers Union of Greater New York, Local 100 ("Local 100" or "Local"), and several employee groups opposed to the ratification of the agreement.[1] Local 100's parent body, Transit Workers Union of America, AFL-CIO ("TWU"), its president Matthew Guinan, Local 100's president John E. Lawe, and NYCTA's chief executive officer Harold L. Fisher are also named as defendants.
Plaintiffs allege that in a referendum tabulated on July 6, 1978, NYCTA employees rejected a proposed contract between Local 100 and the NYCTA by the vote of 8,506 for to 10,825 against. In tabulating the results, however, the union defendants aggregated the votes of NYCTA employees with the votes of those employed by the Manhattan and Bronx Surface Transit Operating Authority ("MABSTOA"), NYCTA's subsidiary. Because MABSTOA employees approved their proposed contract by a vote of 3,214 to 577, the union defendants stated that both contracts, as a package, had passed. Plaintiffs contest the union defendants' determination that the contract between Local 100 and NYCTA for the period April 1, 1978 through March 31, 1980 has been lawfully ratified. Specifically, plaintiffs object to the practice of "package ratification"  the aggregation of the votes of NYCTA employees with the votes of other Local 100 members employed by MABSTOA. The complaint sets forth four causes of action. Defendants' commingling of ballots has allegedly: 1) denied plaintiffs their "equal right to vote" in the contract referendum in violation of § 101(a)(1) of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 411(a)(1); 2) violated the terms of Local 100's bylaws; and 3) violated TWU's constitution. The last claim, which is addressed to the union defendants only, charges them with failing and refusing to bargain in good faith for a better agreement in violation of their duty of fair representation under New York State's Public Employees' Fair Employment Act, Civil Service Law §§ 200 et seq. Jurisdiction is premised upon § 102 of LMRDA, 29 U.S.C. § 412, and principles of pendent jurisdiction. Plaintiffs seek a declaratory judgment to the effect that the proposed contract between Local 100 and NYCTA has been rejected by those eligible to vote and an injunction restraining the defendants from implementing it, as well as damages, both compensatory and punitive.
On July 10, 1978, this court denied plaintiffs' request for a temporary restraining *816 order,[2] but set the matter down for a July 13th hearing on their motion for a preliminary injunction. When the parties returned on the 13th, it was determined that there was no material issue of fact and that a stipulation of facts would be submitted. At counsel's request, the court ordered the trial of the action on the merits to be advanced and consolidated with the determination on the preliminary injunction pursuant to Rule 65(a)(2), Fed.R.Civ.P. The court's review of the stipulation of facts filed on July 19, 1978, however, revealed that material facts concerning past ratification procedures were potentially in dispute, and a further hearing was scheduled for July 24. The record now being complete, the court holds that plaintiffs have failed to state a claim and their complaint is dismissed.

Statement of Facts
Defendant Local 100, an unincorporated association affiliated with defendant TWU, serves as the collective bargaining representative for among others, the employees of seven employers, both public and private, in the transportation industry in New York City (Stipulation of Facts, p. 3). NYCTA and MABSTOA are public benefit corporations created pursuant to Title 9 of the New York Public Authorities Law (McKinney 1970 & Cum.Supp.1977-78). Steinway Transit Corporation, Queens Transit Corporation, Triboro Coach Corporation, Jamaica Buses, Inc. and the Avenue B and East Broadway Transit Company are privately owned transportation companies. Local 100 represents approximately 26,755 persons employed by NYCTA, 4,830 employed by MABSTOA, and a total of 1,130 employed by the five private companies (Id., pp. 3-4). NYCTA employees are engaged in both bus and subway operation and maintenance and comprise 37 distinct job classifications. (Union defendants' Exhibit 18). MABSTOA employees, assigned to buses only, fall into 13 separate maintenance and operation classifications. (Union defendants' Exhibit 17). The difference in the number of classifications is almost entirely a function of NYCTA's distinctive train operations. Thus, only NYCTA has employees classified as "conductor," "towerman," "trackman." But both NYCTA and MABSTOA have employees classified as "bus operator," "helper" and "maintainer." Although the job titles differ, many NYCTA employee job classifications are identical to MABSTOA job classifications in general duties and wage rates. (Compare Union defendants' Exhibits 17 and 18). The employees of the private companies are also limited to surface transit functions.
Article XXV, § 2 of the TWU's Constitution, entitled "Collective Bargaining and Contracts," provides: "Any proposed agreement shall be subject to ratification by the members covered by such proposed agreement." (Defendants' Exhibit 2). Similarly, Article XXVII of Local 100's by-laws provides that:
No proposed contract shall be valid or binding unless first approved by the Local Executive Board and then ratified by the majority of the members voting in the Branch affected: and any contract so approved and ratified, and in conformity with Article XXV of the International Constitution, shall be binding upon the Union, and its members. (Defendants' Exhibit 3).
The by-laws, which were adopted in 1959 and have not undergone any general revision *817 since,[3] designate five branches of the Local. Article XXIV, § 1 provides:
1. Members employed by the New York City Transit Authority shall constitute the Transit Authority Branch:
members employed by Surface Transit, Inc. and its subsidiary Westchester Street Transportation Co., Inc., shall constitute the Surface Branch;
members employed by the Fifth Avenue Coach Lines, Inc., excluding those employed in its former New York City Omnibus operations, shall constitute the Fifth Avenue Branch;
members employed in the former New York City Omnibus operations of the Fifth Avenue Coach Lines, Inc., shall constitute the Omnibus Branch;
members employed by transit companies other than those listed above shall collectively constitute a Branch.
In 1962, however, Surface Transit, Inc., Fifth Avenue Coach Lines, Inc. and New York City Omnibus ceased to operate and the City of New York acquired their properties pursuant to § 20-d of the New York General City Law (Affidavit of John O'Donnell, Co-counsel for union defendants, dated July 12, 1978). That same year the New York State Legislature created MABSTOA as a public benefit corporation empowered to lease and operate the bus lines which the city had condemned. 1962 N.Y. Laws, c. 163, (codified, as amended, at N.Y. Public Authorities Law § 1203-a (McKinney 1970 & Cum.Supp.1977-78)). MABSTOA was created as a subsidiary of NYCTA, which itself had been created by the Legislature in 1953 to acquire and operate transit facilities previously operated by New York City's Board of Transportation. 1953 N.Y.Laws, c. 200 (codified, as amended, at N.Y. Public Authorities Law § 1202 (McKinney 1970 & Cum.Supp.1977-78)). The nine members of the NYCTA board were designated by the Legislature to serve as MABSTOA's directors. MABSTOA was empowered to "appoint officers and employees; assign powers and duties to them and fix their compensation," but the Legislature expressly provided that MABSTOA officers and employees, unlike NYCTA employees, could not acquire "civil service" status.[4] Public Authorities Law § 1203-a(3)(b).
Since 1966, Local 100's Executive Board, with the approval of TWU and all branches of the Local, has conducted joint negotiations with NYCTA and MABSTOA with a single negotiating team. (O'Donnell affidavit, pp. 6-7). Under the Local 100 by-laws, the NYCTA branch is subdivided into seven "divisions" (Defendant's Exhibit 3, Article XXV); the remaining branches are divided into less formally organized "sections" (Id., art. XXVI). Local 100's proposals for contract changes originate in separate division and section meetings. The by-laws provide that these proposals are to be considered by the "Contract Policy Committee for each branch" and that each such committee is "to draw up an integrated and attainable Contract Program for the Branch." (Id., art. XXVII). Since 1966, however, there has been only one "Contract Policy Committee" acting for both NYCTA and MABSTOA employees combined (O'Donnell affidavit, p. 13). Local 100 has thus treated all of its public employees as a single collective bargaining branch. The Contract Policy Committee submits its proposed program for all public employees to the Local Executive Board, which, under the by-laws determines the "final form and content of the *818 Contract Program to be submitted to the Employer." (Defendant's Exhibit 3, art. XXVII).
The Local's manner of presenting contract demands has remained unchanged since 1966. A single union negotiation committee submits one set of demands covering both NYCTA and MABSTOA employees to a single management negotiating team which presents its proposals on behalf of both employers. (O'Donnell affidavit, p. 7). The Local's demands have generally consisted of two parts: general demands applicable across the board to all NYCTA and MABSTOA employees (e. g., wages, pension terms, vacations and holidays, sick leave and general working conditions) and demands for changes in the working conditions in separate departments (divisions and sections) of NYCTA and MABSTOA (Defendants' Exhibits 4A-4F). These demands are presented to the management's representatives at a meeting attended by TWU's and Local 100's officers and by the Chairman of the NYCTA, at which time the management puts forth its counterproposals. The traditional emphasis of the negotiations is upon the system-wide demand for either wage increases or cost-of-living allowances, or both, because these general demands, made on behalf of NYCTA and MABSTOA employees combined, are easily the most costly from management's perspective (Supplemental Affidavit of John O'Donnell, Co-counsel for defendant unions, dated July 18, 1978, pp. 2-3 and Defendants' Exhibits 14-16). These system-wide demands for wage increases and cost-of-living protection are also perceived by the Local to be of the greatest concern to its members, NYCTA, MABSTOA, and private employees alike, as is easily evidenced by the promotional material it distributed to its members before the 1978 contract referendum (Defendants' Exhibits 17, 18, 20, 21; Plaintiffs' Exhibit C). Although Local 100 sent separate flyers to NYCTA, MABSTOA and its private employees (Stipulation of Facts, p. 4), each set of flyers emphasized the generally applicable contract provisions.
The progress of negotiations is reported by the Local's negotiating committee to a joint committee of representatives of the sections and divisions in both NYCTA and MABSTOA, and the negotiating committee is guided by the decisions of the joint committee in proceeding with negotiations (O'Donnell aff. p. 7). After one or two general negotiating sessions, several separate sub-committees are established by both Local 100 and the management to consider the proposals emanating from, and relating to, working conditions in the several departments. NYCTA employees within a given job classification are represented by a different sub-committee than MABSTOA employees in the equivalent job classification (Stipulation of Facts, p. 7). Either the President of Local 100 or another union officer participates in and coordinates the several departmental sub-committee negotiations (Stipulation of Facts, p. 8). Similarly, issues within NYCTA concerning particular departments are handled by different negotiators than those representing MABSTOA on departmental issues concerning the equivalent department within MABSTOA (Id.) These sub-committees meet regularly and generally iron out their differences before the final critical sessions on the general economic demands (O'Donnell affidavit, p. 14).
With the approval of the Public Employment Relations Board, NYCTA and MABSTOA have, over the years, jointly agreed with Local 100 to create fact-finding or mediation panels to assist them in reaching an agreement. In their evidentiary presentations to the panels, both Local 100's representative and the NYCTA-MABSTOA representatives have not distinguished between NYCTA and MABSTOA employees. Arguments concerning costs and revenues are made in a fully statistically integrated manner (O'Donnell affidavit, p. 15 and Defendant's Exhibits 7, 8).
Since 1966, the final agreement of settlement has been formulated as a single agreement (see Exhibit 1) and then presented *819 to MABSTOA and NYCTA employees for ratification. In each of the referenda since 1966, the same basic ballot form has been used:[5]
(Defendant's Exhibits 9A-9E).[6] Thus, in each and every referendum since 1966, a single ballot has been used for NYCTA and MABSTOA employees combined, and ratification has been determined on the basis of the aggregate votes of NYCTA and MABSTOA employees for and against passage.[7]
Soon after it began operations, MABSTOA agreed to take on all employees of the defunct private lines it acquired at the same wages, hours and working conditions, including fringe benefits, as had been provided in contracts between TWU and the former employers (O'Donnell affidavit, p. 6). There were then, and there continue to be, differences in the terms of the NYCTA and MABSTOA contracts. Thus, under the 1978 contract, while NYCTA workers are entitled to twelve paid sick days a year, MABSTOA employees receive only two days of paid sick leave which are granted only after two days of illness. (Stipulation of Facts, p. 5). NYCTA workers receive vacation pay based upon forty hours per *820 week of work without regard to the actual number of hours they work; MABSTOA employees' vacation pay is calculated on the basis of 1/52 of the previous year's earnings (Id., p. 6). There are also some differences in the health plans available to the two groups (Id.). But the basic wage rates and hours for NYCTA and MABSTOA employees in similar classifications remain equal; moreover, NYCTA and MABSTOA employees alike are to receive a 6% across-the-board wage increase, $250 payment for deferred cost of living allowance, and new cost of living allowances of 62¢ per hour. The most important portions of the 1978 agreement from the perspective of management, the unions and the workers are identical for both groups.
The defendants reached a final agreement on the terms of the 1978 agreement early on the morning of April 1st. On or about April 10, 1978, the defendant unions sent a ballot to each member of the Local, including those employed by the private bus lines, and requested each member to vote on the question of ratification. The Local 100 leadership, persuaded that the agreements with the private lines were virtually the same as that with NYCTA and MABSTOA, decided that all members covered by these several settlementspublic and privateshould vote as a unit. (O'Donnell aff., p. 8). The alternatives presented on the uniform ballot were "I accept" or "I reject and vote to strike." (Id.) On April 24, 1978, the day the ballots were to be counted, several of the plaintiffs herein commenced an action in this court challenging both the commingling of ballots and the reference to a strike as one of the voting members' alternatives. Committee of Concerned Transit Workers v. Transport Workers Union of America, 78 Civ. 1853 (CLB). Judge Brieant issued a temporary restraining order against any implementation of the contract because of the commingling of the votes of private employees with those of public employees. (Transcript of April 24, 1978 hearing, p. 18). Because this practice was a departure from previous referenda, and because a previous state Supreme Court injunction forbade the union from taking any action likely to cause any of its employees to strike, the union defendants agreed to hold a new referendum. (Transcript of April 25, 1978 hearing, pp. 4-6). A separate colored ballot was to be provided for each of the seven employee groups, (Id. p. 11 and Plaintiffs' Exhibits K, L). While the unions thus acknowledged that public and private employees' ballots were not to be aggregated for the purpose of determining ratification, they did not indicate whether or not they would consider NYCTA and MABSTOA to be separate ratifying entities.
The second referendum commenced in late June and the tabulation of ballots was completed on July 6. The results were as follows:

 Total Cast Accept Reject Blank Void
NYCTA 19,345 8,506 10,825 12 11
MABSTOA 3,797 3,214 577 5 1
Ave. B
& E. Bway 54 52 2 0 0
Jamaica
Bus 149 137 12 0 0
Queens
& Steinway 401 361 39 1 0
Triboro
Coach 273 219 54 0 0

(Affidavit of Ronald T. Morabito, plaintiff, filed July 11, 1978). Local 100's Executive Board declared the proposed contract with NYCTA ratified, and defendants Guigan and Lawe sent a telegram to NYCTA demanding the contract's implementation (Stipulation of Facts, p. 8). Defendant Fisher has stated that as far as NYCTA is concerned, the contract is ratified and NYCTA is obligated to implement it.

Discussion
Section 101(a)(1) of the LMRDA states:
(a)(1) Equal rights  Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws. *821 29 U.S.C. § 411(a)(1). There is no question that the word "referendum" includes voting upon the terms of a proposed collective bargaining agreement, Trail v. International Brotherhood of Teamsters, 542 F.2d 961, 966 (6th Cir. 1976), or that both TWU and Local 100 are "labor organizations" under the LMRDA. 29 U.S.C. §§ 402(i), (j)(2); 29 C.F.R. § 451.3(a)(4).[8] Since the courts have generally held that employers cannot be held liable under this section, see, e. g., Hayes v. Consolidated Service Corp., 517 F.2d 564, 566 (1st Cir. 1975); Thompson v. New York Central R. R., 361 F.2d 137, 145 (2d Cir. 1966); the crucial issue is whether the union defendants have deprived NYCTA employees of the "equal right to vote" in the referendum.
The phrase "equal right to vote" is by no means self-defining. Of course, when a particular union member or a designated class of union members is prohibited from casting ballots entirely, the denial of the equal right to vote is patent. See, e. g., Acevedo v. Bookbinders & Machine Operators, 196 F.Supp. 308 (S.D.N.Y.1961). But this is not such a case. All NYCTA employees in good standing had the opportunity to cast ballots in the referendum.
In Calhoon v. Harvey, 379 U.S. 134, 139, 85 S.Ct. 292, 295, 13 L.Ed.2d 190 (1964), the Supreme Court held that § 101(a)(1) "is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote." Following Calhoon, the Court of Appeals for the Second Circuit has read § 101(a)(1) rather narrowly.[9] In Gurton v. Arons, 339 F.2d 371 (1964), plaintiff union members proposed resolutions the effect of which was to rescind the result of a prior referendum providing for secret ballot mail votes in elections and to return the method of electing officers to that of voting in person. The resolutions were adopted at a union meeting by a majority of those present. On a questionable interpretation of its by-laws, the International declared the resolutions void. Seeking an injunction, plaintiffs alleged that the International's action deprived them of the "equal right to vote" at union meetings. The district court denied the application and the Court of Appeals affirmed. The Court stated:
[T]he guaranty of the equal right to vote is surely not a general commission for the federal courts to review the constitution and by-laws of the union. As long as no claim is made that provisions of the constitution and by-laws are being applied in such a way as to deny equality in voting, there is nothing in Section 101 which authorizes consideration of those documents. Section 101 grants no power to the courts to examine into whether by-laws were lawfully adopted or repealed.
Id. at 374. Chief Judge Lumbard, in concurrence, analyzed the issue presented as "whether the equal right to vote guaranteed by § 101(a)(1) is infringed if union officers, acting without justification from the union by-laws, void the result of a properly-conducted vote." Id. at 377. Finding that under Calhoon v. Harvey, supra, § 101(a)(1) protects the right to vote only against relatively direct attack, Judge Lumbard *822 concluded that the "indirect" attack alleged  arbitrarily voiding the result of a vote after it was taken  did not violate the statute. Id.
The Gurton approach was recently reaffirmed in Fritsch v. District Council No. 9, 493 F.2d 1061 (2d Cir. 1974). Members of "painters'" locals argued that their voting rights were diluted because members of "autonomous" locals were allowed to vote for the "painters'" collective bargaining representative, while the "painters'" locals were denied the reciprocal right to vote for the "autonomous" locals' representative. Plaintiffs contended that § 101(a)(1) required the union to adhere to the rule of "one-man-one-vote." The Court of Appeals held that "the attack on plaintiffs' voting rights [was] in fact far from direct." Id. at 1063 n. 5. Because plaintiffs did not claim "that they [had] been totally denied the right to vote" or that "the votes of some members count[ed] more than the votes of others," the statute "[did] not require a district court to enforce the `one-man-one-vote' rule in the sense urged here." Id. at 1063 (footnote omitted). Accord, Navarro v. Gannon, 385 F.2d 512, 520 (2d Cir. 1967) cert. denied, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968).
Calhoon, Gurton and Fritsch are persuasive authority in this case. Plaintiffs do not argue that they have been totally denied the right to vote, and they cannot successfully argue that their votes have counted any less than the votes of other union members. All votes of NYCTA and MABSTOA members have counted equally. Here, as in Fritsch, the claim is solely one of the alleged impropriety of permitting certain of plaintiffs' brethren  MABSTOA members  to have a say in the passage of the NYCTA contract.[10] No "direct attack" on plaintiffs' right to vote has ensued.
Plaintiffs seek to distinguish Calhoon, Gurton and Fritsch on the ground that those cases involved elections of union officers, for which elaborate remedies are set forth in Title IV of the LMRDA, 29 U.S.C. §§ 481-83, rather than contract referenda to which Title IV is inapplicable. To be sure, the narrow holding in Calhoon was that disputes relating to the eligibility of candidates must be resolved through the administrative procedures in Title IV. 379 U.S. at 141, 85 S.Ct. 292. But in determining that plaintiffs, who had been deprived of the right to nominate anyone for office but themselves, did not state a claim under § 101, the Court clearly implied that § 101 must be read narrowly whether or not the actions complained of were remediable under Title IV. See id. at 139, 85 S.Ct. 292; Gurton v. Arons, supra, 339 F.2d at 377 (Lumbard, J., concurring). Thus, in Fritsch, supra, the Court of Appeals affirmed the dismissal of the § 101 claim while expressly declining to decide whether plaintiffs had a meritorious claim under Title IV. 493 F.2d at 1064 n. 9. Moreover, a close reading of Gurton v. Arons reveals that no Title IV remedies would have been available in that case. The defendants had voided a vote taken on a resolution concerning future election procedures rather than a vote which itself was part of an election. 339 F.2d at 377. For that reason, Judge Lumbard addressed the § 101(a)(1) issue on the merits after determining that the plaintiffs had no Title IV claim. Id.
Plaintiffs also seek to distinguish Gurton and Fritsch on the ground that the practices challenged in those cases were done in conformity with applicable union constitutions and by-laws. By contrast, plaintiffs argue, the aggregation of NYCTA and MABSTOA ballots contravenes TWU's constitution and Local 100's by-laws. But an action may not be brought under Title I of the LMRDA to enforce provisions of the union constitution or by-laws. Navarro v. Gannon, supra, 385 F.2d at 516 n.6; Birthwright v. Karsch, 413 F.Supp. 119, 121 *823 & n. 7 (S.D.N.Y.1976). "It is only when . . . a claim is made that the constitution [or by-laws are] being applied in such a way as to deprive the local members of their secured rights that the documents may be considered." Navarro v. Gannon, supra, 385 F.2d at 516; citing Gurton v. Arons, supra, 339 F.2d at 374.
The existence of a violation depends on whether, under all the circumstances of the case, the union has discriminated against some of its members and robbed their votes of meaning. But in making this determination the court will naturally consider whether the union has flouted its rules, the egregiousness of the violation, if any; the bad faith in which the violation occurred, and the impact of the violation on the election's outcome.
Bunz v. Moving Picture Machine Operators, 186 U.S.App.D.C. 124, 131 n.53, 567 F.2d 1117, 1124 n.53 (1977).[11]
The provisions of TWU's constitution and by-laws do not expressly prohibit the practice of "package ratification" challenged here. The constitution's requirement that any proposed agreement be ratified "by the members covered by such proposed agreement" may plausibly be read to require only that the proposed package be ratified by the MABSTOA and NYCTA employees in aggregation. The Local's by-laws do divide the membership into five "branches" and provide that no proposed contract is binding until ratification by the majority of the members voting in the branch affected. But the by-laws were drafted in 1959 and there has been no general revision since. The city's condemnation of three private bus lines in 1962 and the subsequent lease of those lines to MABSTOA was a traumatic event in Local 100's history that certainly could not have been foreseen by the drafters of the by-laws. The Local was then faced with the choice of either treating MABSTOA employees as a separate branch for bargaining and ratification purposes or, because the union was required to bargain with an essentially monolithic management team representing both authorities, to treat NYCTA and MABSTOA as a single branch for the purposes of collective bargaining. The evidence is clear that, at least since 1966, MABSTOA and NYCTA employees have been treated as a single branch as to negotiation and ratification of contracts. In 1972, a group of NYCTA employees challenged the implementation of a proposed contract on the precise grounds raised in this case. The New York State Supreme Court, New York County (Amsterdam, J.) denied a motion for a preliminary injunction and stated: "The submission to one vote of the package of contracts with the different employers was, it is undenied, consistent with prior union practice." Warren v. Guinan, No. 3358/72, at 2 (Sup.Ct. March 1, 1972). The failure to codify this procedure in revised by-laws does not render it illegal, at least for the purposes of plaintiffs' § 101 claim.
Just as does any representative body [a union] functions in part according to the formal provisions of its By-Laws, and in part by the observance of time-honored, unwritten customs and traditions. It is from both sources that [the court] must ascertain [the manner in which it operates.]
Schonfeld v. Raftery, 359 F.Supp. 380, 384 (S.D.N.Y.1973), aff'd sub nom., Fritsch v. District Council No. 9, supra.
Bunz v. Moving Picture Machine Operators, supra, the case upon which plaintiffs principally rely, is thus readily distinguishable. In that case, the local's by-laws required that assessments be approved by two-thirds of the members present. In a membership referendum, only fifty-nine per cent of the members present approved the imposition of a certain assessment. 186 *824 U.S.App.D.C. at 126, 567 F.2d at 1119. Nevertheless, the local determined that the assessment was ratified. The District of Columbia Court of Appeals held that the local thereby discriminated against plaintiff, who had voted against the assessment, by "issuing a patently frivolous interpretation of its [by-laws which] raised the percentage of votes required to defeat the assessment from 34% to 51%." Id. at 129, 567 F.2d 1122. In light of the thirteen year history of package ratification in Local 100 over the course of seven contract referenda, the Local's interpretation of its by-laws in this case can hardly be characterized as "patently frivolous." In short, the court finds that Local 100's implementation of "package ratification" does not violate its rules and that the Local has not discriminated against the plaintiffs in the exercise of their right to vote.[12] Accordingly, plaintiffs fail to state a claim under § 101(a)(1) of the LMRDA.

The State Law Claims
Plaintiffs' remaining claims all arise under state law. The only jurisdictional basis for these claims is this court's pendent jurisdiction. Unless the federal claim alleged is "insubstantial . . . or otherwise completely devoid of merit," Hagans v. Lavine, 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974) (citation omitted), this court may, in its discretion, determine the state claims presented if they "derive from a common nucleus of operative fact." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Although the court finds that plaintiffs fail to state a claim, the federal claim presented is not so insubstantial as to preclude the exercise of pendent jurisdiction.
The second and third causes of action allege breaches of the Local 100 by-laws and TWU's constitution respectively. In New York, "the constitution and by-laws of an unincorporated association express the terms of a contract which define the privileges secured and the duties assumed by those who have become members." Polin v. Kaplan, 257 N.Y. 277, 281, 177 N.E. 833, 834 (1931). Accord, O'Keefe v. Local 463, 277 N.Y. 300, 304, 14 N.E.2d 77, 78 (1938). When the provisions of the constitution and by-laws are clear and explicit, their terms may not be ignored. Fritsch v. Rarback, 199 Misc. 356, 359, 98 N.Y.S.2d 748, 753 (1950). But when a document is silent or ambiguous on a certain point, New York courts will
look to the practical construction, as evidenced in their conduct, that the Union and its members have given to it. "There is no surer way to find out what the parties meant than to see what they have done." And what the parties have done by uniform and unquestioned acts, from the outset and over a long period of time, is entitled to great, if not controlling, weight . . ..
Caliendo v. McFarland, 13 Misc.2d 183, 188, 175 N.Y.S.2d 869, 875 (1958). (citing many cases). The acquisition of the defunct private lines by MABSTOA in 1962 created an obvious ambiguity in Local 100's by-laws; ratification required the approval by the members of the branches affected, but the branches were defined in terms of employers who no longer existed. Since 1966, the Local has resolved this ambiguity by treating MABSTOA and NYCTA as a single branch for the purposes of contract negotiation *825 and ratification. "The constitution of an organization is not a static thing." Dunne v. Hoffa, 231 N.Y.S.2d 352 (Sup.Ct. 1962). The consistent interpretation and application of the by-laws in this manner is entitled to "impelling weight." Caliendo v. McFarland, supra, 13 Misc.2d at 189, 175 N.Y.S.2d at 876. The TWU constitutional provision in issue here is sufficiently flexible to support the Local's interpretation of its by-laws because it provides only that a proposed agreement be subject to ratification by the members covered by it. The constitution does not exclude the possibility of package ratification, so long as all members covered by the package agreement have a voice in its ratification. The court thus finds that neither the constitution nor the by-laws have been violated here.
Plaintiffs' fourth cause of action charges the union defendants with breach of their duty of fair representation under New York's Public Employees' Fair Employment Act, Civil Service Law §§ 200-14 by failing and refusing to bargain in good faith with NYCTA for a new agreement after learning that the majority of NYCTA employees had rejected the proposed agreement. As recognized employee organizations before the Public Employee Relations Board, the defendant unions have the obligation to represent all of their employees fairly and impartially. DeCherro v. Civil Service Employees' Ass'n, Inc., 60 A.D.2d 743, 400 N.Y.S.2d 902, 903 (3d Dep't 1977); Wald v. Nassau Chapter Civil Service Employees Ass'n, Inc., 72 Misc.2d 723, 725, 340 N.Y.S.2d 451, 454 (Sup.Ct.1973). "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." McKay v. Smith, 92 Misc.2d 606, 608, 400 N.Y.S.2d 708, 710 (Sup.Ct.1977), quoting, Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). In light of the history of "package ratification" in Local 100, already outlined in detail, the court finds that the unions' adherence to it in 1978 is neither arbitrary, discriminatory nor imposed in bad faith.
Let the clerk enter judgment dismissing the complaint with prejudice.
So Ordered.
NOTES
[1] Plaintiffs purport to sue on behalf of the class of all NYCTA employees represented by Local 100 for the purposes of collective bargaining and the subclass of all NYCTA employees who voted to reject the agreement. In light of the procedural history of this case, see infra, defendants have not formally opposed the certification of a class and the court makes no determination of this issue.
[2] Plaintiffs failed to show that implementation of the proposed contract would result in irreparable injury, a prime requisite for the extraordinary relief of a temporary restraining order. Luster Enterprises, Inc. v. Jacobs, 278 F.Supp. 73, 74 (S.D.N.Y.1967). Their sole offer of proof of injury was the conclusory assertion that under the terms of the proposed contract, which permit NYCTA to hire 200 part-time employees to man presently closed subway token booths, many of the plaintiffs would be laid off (Affidavit of James Reif, Co-counsel for plaintiffs, dated July 10, 1978). Counsel for NYCTA assured the court that there would be no layoffs resulting from this hiring of part-time employees (Transcript of July 10, 1978 hearing, pp. 15-16).
[3] A single special amendment was adopted in 1969 which did no more than add an executive vice president to the number of Local 100's officers. (Affidavit of John O'Donnell, Co-counsel for union defendants, dated July 12, 1978).
[4] This provision has been upheld against state constitutional attack on various occasions. See, e. g., Bell v. Manhattan & Bronx Surface Transit Operating Authority, 81 Misc.2d 162, 364 N.Y.S.2d 274 (Sup.Ct.1974); Lorelli v. Manhattan & Bronx Surface Transit Operating Authority, 48 Misc.2d 944, 266 N.Y.S.2d 223 (Sup.Ct.1966).
[5] In 1966 and 1968, the ballot differed only in that the preamble read: "I have considered the recommendations of the International and Local Officers and the Local Executive Board on the proposed terms of a new 2-year agreement. I record my vote as follows: . . ." (Defendants' Exhibits 9A and 9B).
[6] In 1974, the ballot sent MABSTOA employees differed in color but not in content from the ballot sent NYCTA employees (O'Donnell aff., p. 16), but the ratification was determined on the basis of the aggregate total.
[7] At the hearing on July 24, 1978, John O'Donnell, counsel for the Local since 1948, testified that ratification has been determined by the Local in this manner since 1966 and the court finds his testimony to be wholly credible. Plaintiffs did introduce at that hearing certified tabulations of results compiled by the American Arbitration Association ("AAA") for the 1972 and 1974 referenda which appear to aggregate not just NYCTA and MABSTOA votes but the votes of all employees. (Plaintiffs' Exhibits 1 and 6). Plaintiffs argue that these certified tabulations prove that the Local has, in the past, determined ratification by aggregating the votes of all employees, public and private. But the AAA, in the years it was employed by Local 100, was hired only to tabulate the vote, not to determine whether or not any contract was ratified. In any event, the letter of agreement between the Local and the AAA for 1972 specifically makes note of the fact that there are to be two separate ballots  one to cover the members employed by NYCTA and MABSTOA, the other to cover those employed by the private lines (Plaintiffs' Exhibit 5). It is clear, therefore, that the Local did not direct the AAA to aggregate public and private line votes. The letter of agreement in 1974 authorized the AAA to conduct the referendum "in conformity with the constitution and by-laws of the T.W.U." (Plaintiffs' Exhibit 4), and mentions nothing with respect to aggregation.
[8] NYCTA is not an "employer" as that term is defined in the LMRDA. 29 U.S.C. § 402(e) excludes "any corporation wholly owned by the Government of the United States or political subdivision thereof." However, the Department of Labor's regulations provide that "in the case of a national or international labor organization composed both of government locals and non-government or mixed locals, the parent organization as well as its mixed and non-government locals would be labor organizations and subject to the Act." 29 C.F.R. § 451.3(a)(4) (1977). Thus, Local 100 and TWU are both within the LMRDA's scope.
[9] Even prior to Calhoon, the Court of Appeals refrained from giving a broad reading to the phrase "equal right to vote." In Robins v. Rarback, 325 F.2d 929 (2d Cir. 1963), plaintiff asked the court to "construe the language of [§ 101(a)(1)] as granting authority to the federal courts to control and direct the entire conduct of union elections on the theory that the right to vote is a right to cast an `effective' vote, and that a vote cannot be effective unless the election is properly conducted in all its aspects." Id. at 930. The court stated that it "would be reluctant to hold that such a simple guaranty of the right to vote would carry with it the broad implications with which the plaintiff would freight it." Id.
[10] In a sense, plaintiffs' position is less sympathetic than that of the plaintiffs in Fritsch. In that case, plaintiff members of the "painters'" locals had no voice in the selection of the bargaining agents for "autonomous" locals. Under the package ratification format challenged here, however, NYCTA employees have a voice in determining both their fate and the fate of MABSTOA employees.
[11] As the Bunz court noted, § 101(a)(1)'s proviso that the equal right to vote is "subject to reasonable rules and regulations in such organization's constitution and by-laws" does not direct a union to conduct referenda in accordance with its constitution and by-laws. Rather than elaborate or "define" the equal right to vote, the proviso permits its limitation  a union may enact rules restricting the equal right to vote provided those rules are reasonable. 186 U.S.App.D.C. at 128 n.17, 567 F.2d at 1121 n.17.
[12] The practice of package ratification does not, in and of itself, violate § 101. In Davey v. Fitzsimmons, 413 F.Supp. 670 (D.D.C.1976), plaintiffs challenged the International Brotherhood of Teamsters' practice of ratifying their national agreements, and the regional riders thereto, on a nationwide, package basis. Concluding that the Teamsters' constitution authorized this practice, the court dismissed plaintiffs' § 101 claim and stated:

While package ratification may not represent the most desirable mode of ratification from the point of view of all union members, it neither dilutes the voting power of any individual or group nor discriminates against any individual or group. Each member has the opportunity to vote to accept or reject a proposed contract according to whatever criteria he or she chooses. Each vote counts the same and has the same effect. In short, none of the effects of voting schemes found in other contexts to be illegal is present here.
Id. at 677.