Scott CUNNINGHAM, Richard Egan, James McNally, Charles Abruzzo, Kenneth Brengel, Anthony Colazzo, Anthony Calvanico, Vincent Campisi, Joseph Cartolano, Edward Chapman, William Cullen Jr., Angelo DeVito, Kerry Dickens, Ronald Dirks, Kenneth Egan, John Gilmour, Josephus Greenidge, John Hawkins, Richard Joyce, William Kay, John Mauriello, Robert McLaughlin, Robert Molloy, Roy Montgomery, Dennis Moynihan, Roland Ng, Richard Oertle, Walter Rau, Louis Riconda, William Roche, Gerald Sorgente, Victor Straub, Henry Surig, and Christopher Werner, Plaintiffs,

v.

LOCAL 30, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO; James Hanley, as Commissioner of Labor for the City of New York; and Alan Hevesi, as Comptroller of the City of New York, Defendants.

No. 99 Civ. 10965(MBM).

United States District Court, S.D. New York.

Dec. 10, 2002.

Susan Jennik, Kennedy, Schwartz & Cure, P.C., New York, NY, for Plaintiffs.

Mark Steven Soroka, Adam Ira Klein, P.C., New York, NY, for Defendant, Local 30.

Michael A. Cardozo, Corporation Counsel of the City of New York, Adam G. Kurtz, New York, NY, for City Defendants, of counsel.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiffs are members of defendant Local 30, International Union of Operating Engineers ("Local 30"), and are employed by the City of New York ("the City"). Plaintiffs sue Local 30 alleging that the manner in which Local 30 conducted the ratification vote on their contract violated Section 101(a)(1) and (a)(2) of the Labor Management Reporting and Disclosure Act ("LMRDA"), violated the Constitution of the International Union of Operating Engineers ("IUOE Constitution"), and breached Local 30's duty of fair represen-

tation to its members. In addition to suing their union, plaintiffs sue the City's Commissioner of Labor and its Comptroller (the "City defendants"), seeking to void the terms of the contract between Local 30 and the City.

Local 30 moves for summary judgment pursuant to Fed.R.Civ.P. 56(b). City defendants renew their motion to dismiss for failure to state a claim and alternatively seek summary judgment. For the reasons stated below, Local 30's motion for summary judgment is granted with respect to the LMRDA claim. This court lacks subject matter jurisdiction over the IUOE Constitution claim, and declines to exercise supplemental jurisdiction over the state-law duty of fair representation claim. The City defendants' motion is granted.

I.

The following facts are undisputed except as described otherwise. Local 30 is a labor organization, chartered by the IUOE, with approximately 3000 members employed mostly to operate and maintain mechanical systems in buildings and plants. (Local 30's 56.1 ¶ 1; Pl.'s 56.1 ¶ A1) Local 30 represents employees in both the public and private sectors. (Am. Compl. ¶ 4; Ans. ¶ 4; Local 30's 56.1 ¶ 20) Approximately 600 of Local 30's members are employed by the City of New York in five different titles ("City members"). About 170 are employed in the job titles of Oiler and Plant Maintainer. These titles promote to the titles of Stationary Engineer and Stationary Engineer outside New York City, which include roughly 370 Local 30 members. About 65 Local 30 members have been promoted from these titles to the Senior Stationary Engineer title. (Local 30's 56.1 ¶ 2; Pl.'s 56.1 ¶ A2)

James Hanley is Commissioner of Labor for the City of New York and the chief negotiator of labor agreements. He and

his staff negotiate collective bargaining agreements with labor unions including Local 30. (Local 30's 56.1 ¶ 3; Pl.'s 56.1 ¶ A3) The wages and benefits of Local 30 City members are determined by the Comptroller of the City of New York (formerly Alan Hevesi) and his staff, in accordance with Section 220 of New York State Labor Law. (Local 30's 56.1 ¶ 4; Pl.'s 56.1 ¶ A4) Section 220 provides that skilled trade employees of the City of New York are to be paid the wages and benefits prevailing in comparable private sector jobs. The City and the unions representing the "prevailing rate" titles can negotiate an agreement that is adopted by the Comptroller by consent. If the parties are unable to negotiate the prevailing wages and benefits, the Comptroller must perform surveys in the private sector to determine the rates. (N.Y. Lab. Law § 220; Local 30's 56.1 ¶ 4; Pl.'s 56.1 ¶ A4)

Plaintiffs are 34 members of Local 30 employed by the City of New York in the title of Senior Stationary Engineer ("Seniors"). (Am.Compl.¶ 3)

On May 26, 1999, the City presented Local 30 with an offer covering the wages and benefits for all five titles, for the period July 1, 1995 to June 30, 1999. (Am. Compl. ¶ 11; Local 30's 56.1 ¶ 21) Local 30 conducted a membership ratification vote on the offer by counting the votes of all union members together, rather than separately by title. (Am. Compl. ¶ 12; Local 30's 56.1 ¶ 30; Pl.'s 56.1 ¶ A30) Prior to the 1995–1999 agreement, there were individual agreements for each title, which were ratified separately by the title covered in the individual agreement. (Am. Compl. ¶ 13; Pugh Dep. at 18–23)

Under the consent determinations covering the period October 1, 1991 to June 30, 1995, Stationary Engineers and Seniors had fewer holidays, vacation days, and sick and other excused days as well as a lower contribution toward retirement benefits than the Oiler and Plant Maintainer titles. (Local 30's 56.1 ¶ 7–8; Pl.'s 56.1 ¶ A7–A8) Local 30 asserts that the disparity in benefits among these titles was causing dissension because upon promotion to Stationary Engineer, an employee lost benefits. (Local 30's 56.1 ¶ 9–10) Plaintiffs assert there was also dissatisfaction about the narrowing of wage differences between and among titles. (Pl.'s 56.1 ¶ 3, ¶ A10)

In 1997, Local 30 conducted a survey of City members to determine priorities for upcoming negotiations. (Local 30's 56.1 ¶ 11; Pl.'s 56.1 ¶ A11) According to Local 30, the survey was answered by 31 Seniors, 234 Stationary Engineers, and 67 Oilers. Among Seniors, 16 wanted improved benefits and 15 wanted improved wages. Among Stationary Engineers, 135 wanted improved benefits and 99 wanted improved wages. Among Oilers, 50 wanted improved wages and 17 wanted improved benefits. (Local 30's 56.1 ¶ 12) Local 30 says that based on these survey results, as well as the observed dissension among members, it decided to make equalizing benefits among titles a priority in the negotiations. (Local 30's Mem. at 21) Plaintiffs dispute Local 30's interpretation of the survey results. (Pl.'s 56.1 ¶ 4)

Local 30 appointed a negotiating committee made up of Local 30 members from all the titles. At the first meeting in late 1997, the group discussed enhancing benefits for the Seniors and the Stationary Engineers. (Local 30's 56.1 ¶ 13; Pl.'s 56.1 ¶ A13)

The first negotiating session with the City was on January 22, 1998. In attendance, among others, was Dennis Steiner, the City negotiator, Local 30 President John Ahern, Business Representative Jim Gannon, and Field Representative Donald Pugh ("Local 30 leadership" or "Local 30"). (Local 30's 56.1 ¶ 14; Pl.'s 56.1

¶ A14) The City's offer at this meeting, referred to as the "citywide offer," was a five-year agreement that offered no wage increases for the first two years and then increases totaling roughly 12 percent in the last three years of the agreement. This offer did not address the benefit disparities among the titles. (Local 30's 56.1 ¶ 14; Pl.'s 56.1 ¶ A14) After surveying membership, Local 30 rejected the citywide offer. (Local 30's 56.1 ¶ 15; Pl.'s 56.1 ¶ A15)

Local 30 leadership and the City disagree about who first proposed the idea of having a single consent determination, covering all titles, rather than separate agreements for each title—as had been the past practice. Local 30 asserts that it was the City that first proposed having a single consent determination. (Local 30's 56.1 ¶ 19). However, the City says that Local 30 first expressed interest in a single consent determination. (City's 56.1 ¶ 3) Dennis Steiner, the negotiator for the City, said: "both Local 15 and Local 30 initiated the proposal of trying to address their joint issues in the context of one consolidated consent determination.... The City did not initiate that proposal." (Steiner Dep. at 53) Plaintiffs argue that this disagreement is a genuine issue of material fact. Local 30 admits that there is some dispute regarding who first suggested joint negotiations, but argues that this dispute is not material. (Local 30's Reply Mem. at 9)

On May 26, 1999, the City made an offer covering four proceeding years (from July 1, 1995 to June 30, 1999) and all the titles. Under the offer, the hourly wages for all titles increased. The wages for the Seniors increased also each year—from $32.93 in 1995 to $35.67 in 1999. However, on the last day of the contract, the Seniors' wages dropped back to $32.30. (Soroka Decl., Ex. L; Local 30's 56.1 ¶ 21) Thus the

Seniors would receive back pay, but virtually no increase going forward. Local 30 claims that it tried to get the City to increase the final wage of the Seniors but that the City would not vary its proposal. (Local 30's 56.1 ¶ 22). Local 30 asserts that the offer equalized benefits among the titles and increased the Seniors' annuity benefits. (Local 30's 56.1 ¶ 21) Plaintiffs state that the offer did not in fact equalize benefits over the course of the agreement—benefits became equal only at the very end of the term. (Pl.'s 56.1 ¶ 2) Plaintiffs state also that although the annuity contribution was equalized by the end of the contract, the contribution was paid for Oilers and Plant Maintainers on an hourly basis but paid for Seniors and Statutory Engineers on a daily basis, so those employees would be paid only for complete days. (*Id.* ¶ 2)

According to Local 30, the City informed the union that if the consent determination was rejected or litigated by any one of the titles it would be withdrawn as to all. (Local 30's 56.1 ¶ 22) According to Ahern, the City's view was that "[i]f any one title refuses it, then [the City wanted] to take the entire decree off the table." (Ahern Dep. at 59) Gannon indicated also that the City said that, if one title voted the consent determination down, it would be withdrawn as to all. (Gannon Dep. at 36–37) Steiner, the City negotiator, said: "What I said to both Locals 15 and 30 was that for this particular deal to work, we needed a ratification on behalf of each entity within Local 15 and 30; how that was done, I did not discuss." (Steiner Dep. at 55) During their depositions, Pugh and Ahern pointed to a letter that they said showed the City's position that if one title refused the offer it would be withdrawn as to all. (Pugh Dep. at 50; Ahern Dep. at 95–96) Plaintiffs allege that this letter, which stated that the agreement would no longer be binding on the parties if the parties failed to reach

a consent agreement, referred to the period commencing July 1, 1999—not the period covered by the City's offer, 1995 to 1999. (Pl.'s 56.1 ¶ A22)

Local 30 leadership held a union membership meeting on June 1, 1999. (Local 30's 56.1 ¶ 24; Pl.'s 56.1 ¶ A24) At this meeting members were told that the City had made an offer and the offer would be submitted for ratification as one consent determination. Local 30 advised members that they would vote on the offer by mail ballot and the Honest Ballot Association was chosen to handle the ratification vote. *Id.* Union members, including Seniors as well as those in other titles, objected at the June 1 meeting to the plan for a joint ratification vote. (Pugh Dep. at 75) Local 30 did not tell the members the specific terms of the City offer at this meeting, and thus the Seniors did not find out that their wage dropped on the last day of the agreement. (Pugh Dep. at 45) Local 30 asserts that it had not had time to prepare the City's proposal to show membership at this meeting. (Local 30's 56.1 ¶ 24)

Local 30 scheduled a meeting for July 7, 1999 with the Negotiating Committee and City Shop Stewards, to pass out and review the agreement. (Local 30's 56.1 ¶ 25; Pl.'s 56.1 ¶ A25) After seeing the City's proposal, the Seniors present at this meeting expressed their unhappiness with the drop in their wages on the last day of the contract. (Local 30's 56.1 ¶ 25; Pl.'s 56.1 ¶ A25) Plaintiffs allege that at this meeting Ahern stated that the City was setting the voting requirements. (Pl.'s 56.1 ¶ 7) Plaintiff Cunningham said that Ahern stated that "Local 30 had to comply with the voting requirements set by the City Office of Collective Bargaining ... and that the proposed Consent Determination would be voted on by all five titles together." (Cunningham Aff. ¶ 5) Cunningham said: "Ahern also rejected a proposal that, for

internal union 'survey' purposes, the balloting of employees in different titles be tabulated separately. He called such a proposal 'illegal' and stated that he wanted no record of a 'No' vote by employees in particular titles." (Cunningham Aff. ¶ 5) The Seniors at the meeting asked for a separate meeting with Local 30 leadership, and one was scheduled for June 23, 1999. (Local 30's 56.1 ¶ 26; Pl.'s 56.1 ¶ A26)

On June 8, 1999, Local 30 sent out the ballot package to City members and informed them that the ballots would be counted on July 1, 1999. (Local 30's 56.1 ¶ 27; Pl.'s 56.1 ¶ A27)

Forty-three Seniors attended the June 23, 1999 meeting. The Seniors complained about the wage adjustment on the last day of the agreement and about the plan for a joint ratification vote by all five titles. (Local 30's 56.1 ¶ 28; Pl.'s 56.1 ¶ A28) Plaintiffs allege that Ahern told them at this meeting that the City was insisting on the joint ratification vote. Cunningham said in reference to Ahern's statements: "What was said was that due to the fact that it was one-consent determination the City wanted all our votes together, and we cannot separate them out." (Cunningham Dep. at 127) Plaintiff Egan stated: "the basic question was [whether] the City was making the rules on this, which is the way we had the vote, and Jack Ahern stated again, 'Yes, this is the way it has to be. This is the way the City has, you know, made the offer; this is the way the City states that you have to vote this way all collectively.'" (Egan Dep. at 73) At the June 23 meeting Seniors circulated a petition urging the City to nullify the vote. (Egan Dep. at 73) According to Egan: "Jack Ahern and Mike Hack said they would sign on to any supportive measures that the senior stationary engineer would take to get this declared a new vote." (Egan Dep. at 74) However, Egan said

that "when the petition went around the room and we placed it before Jack Ahern and Mike Hack, they just walked away from it." (Egan Dep. at 74) Egan said that this petition, signed by 43 members, was sent to the New York City Office of Labor Relations and OCB "asking [them] to nullify the vote." (Egan Dep. at 74) Pugh said that Hack told the Seniors "that he would do everything in his power to . . . fight the City's position on one determination or something, you know, try to do something, if he could." (Pugh Dep. at 60)

Ahern denied telling the membership that the City had dictated the type of ratification vote that would take place, (Ahern Dep. at 93), and asserted that it was the union's decision to conduct the collective vote. (Ahern Dep. at 87) Pugh said that Ahern made the decision that the vote would be counted with all titles together. (Pugh Dep. at 51) Ahern stated that he did not remember discussing with the City how the vote would be conducted. (Ahern Dep. at 87–88) Gannon said he did not remember who decided that the vote would include all titles togther, but that he was part of this decision. (Gannon Dep. at 49–50)

Pugh was asked if Ahern stated at the June 1 meeting that the City was requiring the pooled voting arrangement and he responded: "Not to my knowledge." (Pugh Dep. at 46) Gannon said that he could not recall whether Ahern told the membership that the City required that the proposal be voted on by all the titles together. (Gannon Dep. at 46)

The City claims it had no discussions with Local 30 regarding the union's ratification procedure. (City's 56.1 ¶ 6) Dennis Steiner, the negotiator for the City, said that he "had no discussion with either union [Local 15 or Local 30] on their ratification." (Steiner Dep. at 54) Steiner was asked: "Did you say that it was the City's

position that the Local 30 members in all five titles had to ratify or vote to ratify this proposal together?" He responded: "Not at all." (Steiner Dep. at 55)

Although the May 26, 1999 City offer was a single consent determination covering all five titles, Local 30 does not argue that the titles could not have voted on the contract separately. If one title had voted down the agreement, apparently Local 30 and the City could have continued negotiations. Pugh was asked if anything would have prevented the parties from negotiating a new agreement and he responded that there was not. (Pugh Dep. at 51) Ahern stated also that if each title voted separately, and one rejected it, they would go back to negotiations. (Ahern Dep. at 67)

On July 1, 1999, the ballots were counted. The vote was 322 for the consent determination and 175 against it. (Local 30's 56.1 ¶ 30; Pl.'s 56.1 ¶ A30). In a letter dated July 6, 1999, Gannon advised the City that the contract had been ratified. (Local 30's 56.1 ¶ 31; Pl.'s 56.1 ¶ A31)

By a petition verified on June 15, 1999, Plaintiff Brengel filed an Improper Practice Petition before the New York City Office of Collective Bargaining claiming Local 30 had violated its duty of fair representation by holding a joint ratification vote. (Local 30's 56.1 ¶ 32; Pl.'s 56.1 ¶ A32) The petition was signed by 43 Seniors. (Brengel Dep. at 60; Soroka Decl., Ex. N)

In a letter dated December 7, 1999, Plaintiffs Cunningham, Egan, and McNally appealed the way Local 30 had conducted the ratification vote. (Local 30's 56.1 ¶ 34; Pl.'s 56.1 ¶ A34; Soroka Decl., Ex. S) Upon receiving the appeal, the Local 30 Executive Board referred the matter to

IUOE General President Frank Hanley. (Local 30's 56.1 ¶ 35; Pl.'s 56.1 ¶ A35)

Plaintiffs filed this lawsuit on October 29, 1999, and filed an amended complaint on January 13, 2000. On January 14, 2000, Local 30 moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) on the grounds that this court lacked subject matter jurisdiction over the case due to the failure of plaintiffs to exhaust administrative remedies, specifically by pursuing Improper Labor Practices claims before the New York City Board of Collective Bargaining. Local 30 argued also that plaintiffs failed to exhaust internal union remedies because they had not obtained a decision from the IUOE General President as to whether the joint ratification vote violated the IUOE Constitution. Alternatively, Local 30 sought a stay of the proceedings in this court pending final determinations by these entities.

On February 15, 2000, the City defendants filed a motion to dismiss for failure to state a claim and for lack of jurisdiction, and asked this court to decline to exercise supplemental jurisdiction, or to abstain from exercising jurisdiction under various doctrines.

By a letter dated February 18, 2000, General President Hanley denied the appeal filed by Cunningham, Egan, and McNally, finding that the joint ratification vote complied with the IUOE Constitution. Hanley stated:

> Article XXIV, Subdivision 11, Section (e) of the International Constitution provides for approval of Local Union collective bargaining agreements by the "membership affected," unless the Local has delegated the authority to approve agreements to its Executive Board or to its bargaining committee. As indicated in your letter, the Local Union determined that the membership affected in this particular instance included mem-

bers in all five titles because the City's offer extended to all five titles, and, therefore, the Local had members in all five titles vote jointly on the matter. In light of the nature of the City's offer, the Local's interpretation of the membership affected by that offer was a reasonable one and the joint vote by the five titles complied with the requirements of the International Constitution.

(Soroka Decl., Ex. U; Local 30's 56.1 ¶ 36; Pl.'s 56.1 ¶ A36)

On June 27, 2000, the Board of Collective Bargaining dismissed the Improper Practice Petition. The Board concluded that it found "no evidence that the Union acted in a way that was arbitrary, improperly motivated, or in bad faith." (Soroka Decl., Ex. V; Local 30's 56.1 ¶ 33; Pl.'s 56.1 ¶ A33)

On August 3, 2000, this court issued an order denying as moot Local 30's motion to dismiss or stay for failure to exhaust administrative proceedings. On August 28, 2000, this court denied the City defendant's motion to dismiss without prejudice to later renewal. *See Cunningham v. Local 30, Int'l Union of Operating Eng'rs*, 99 Civ. 10965, 2000 WL 1219418 (S.D.N.Y. Aug.28, 2000).

## II.

### A. *LMRDA Claims*

■ Plaintiffs assert that Local 30's decision to hold a joint ratification vote violated Sections 101(a)(1) of LMRDA. Title I of LMRDA, entitled the Bill of Rights of Members of Labor Organizations, guarantees various rights. Section 101(a)(1) provides:

> Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to at-

tend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1) (2000). Section 102 of the Act provides that "[a]ny person whose rights secured [by Title I] have been infringed" may bring a civil action in federal district court where the alleged violation occurred. 29 U.S.C. § 412. Plaintiffs allege that by diluting the vote of the Seniors through the joint ratification vote, Local 30 deprived them of their equal right to vote on the agreement in violation of Section 101(a). (Am.Compl.¶ 19)

■ The term "labor organization" under LMRDA is defined as an entity that "exists for the purpose, in whole or in part, of dealing with employers concerning" various terms of employment. 29 U.S.C. § 402(i). This section excludes from the definition of employer "the United States or any corporation wholly owned by the Government of the United States or any State or political subdivision thereof." *Id.* § 402(e). Unions consisting entirely of public employees are not subject to LMRDA. *See, e.g., Brock v. S. Region, Region III of the Civil Serv. Employees Ass'n,* 808 F.2d 228, 231 n. 3 (2d Cir.1987); *N.J. County & Mun. Council No. 61 v. Am. Fed'n of State,* 478 F.2d 1156, 1158 (3d Cir.1973).

■ However, the Secretary of Labor has issued a regulation concluding that unions that represent both public and private sector employees are labor organizations subject to LMRDA provisions, *see* 29 C.F.R. 451.3(a)(4) (2002), and courts have held that LMRDA applies to these mixed unions, *see London v. Polishook,* 189 F.3d 196, 198 (2d Cir.1999) (citing cases all "subscribing to the proposition that unions that represent and bargain for *both* public

and private sector employees are subject to the Act"); *Laity v. Beatty,* 766 F.Supp. 92, 97–98 (W.D.N.Y.1991) ("[W]hether or not Laity is entitled to the protection of Title I depends, not on his employer, but whether his labor union falls within the Scope of Title I.... [T]his Court finds that the LMRDA protects mixed union employees."); *Black v. Transp. Workers Union,* 454 F.Supp. 813, 821, n. 8 (S.D.N.Y.1978) (relying on 29 C.F.R. § 451.3(a)(4) and holding that mixed unions are within LMRDA's coverage); *see also Wildberger v. Am. Fed'n of Gov. Employees,* 86 F.3d 1188, 1192 (D.C.Cir.1996). A union that represents both private and public sector employees is subject to LMRDA, even if the member bringing suit is a public employee. *See Kinslow v. Briscoe,* No. 92 CV 4830, 1993 WL 72336, at *5 n. 1 (N.D.Ill. Mar.12, 1993) (collecting cases).

Local 30 represents both public and private sector employees. (Am. Compl. ¶ 4; Ans. ¶ 4; Local 30's 56.1 ¶ 20) Therefore, plaintiffs can sue under LMRDA. This court has subject matter jurisdiction over the LMRDA claims under Title 29, Section 412, of the United States Code.

In *Calhoon v. Harvey,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964), the Supreme Court said that Section 101(a)(1) is "no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote." *Id.* at 139, 85 S.Ct. 292. The Second Circuit has interpreted Section 101(a)(1) of LMRDA narrowly. In *Fritsch v. District Council No. 9,* 493 F.2d 1061 (2d Cir.1974), the plaintiffs, members of a local painters' union, claimed that their voting rights were diluted in violation of LMRDA because the members of the "autonomous locals" could vote for the principal collective bargaining representative of the painters, but painters had no

reciprocal right to vote for the collective bargaining representatives of the autonomous locals. *Id.* at 1062. The Second Circuit noted that the plaintiffs had not been "totally denied the right to vote for important union offices" nor was "there a claim that the votes of some members count[ed] more than the votes of others in the election." *Id.* at 1063. The Court concluded that "the command of Title I does not require a district court to enforce the 'one-man-one-vote' rule in the sense urged here." *Id.; see also Amirault v. Shaughnessy,* 749 F.2d 140, 144 (2d Cir. 1984) (stating that LMRDA "prohibits discrimination against members and classes of members in their right to vote and protects against direct infringements of that right") (citation omitted); *Navarro v. Gannon,* 385 F.2d 512, 520 (2d Cir.1967) (stating that under *Calhoon,* "voting rights protected by Section 101(a)(1) must be directly attacked to warrant suit under Section 102").

Other courts have held that pooled voting does not violate LMRDA. *See Black v. Transport Workers Union of America,* 454 F.Supp. 813 (S.D.N.Y.1978) ("package ratification" of contracts by employees both of a transit authority and its subsidiary did not violate LMRDA); *see also Davey v. Fitzsimmons,* 413 F.Supp. 670, 677 (D.D.C.1976) (dismissing plaintiffs claim that package ratification violated Section 101(a)(1) and stating that "[w]hile package ratification may not represent the most desirable mode of ratification from the point of view of all union members, it neither dilutes the voting power of any individual or group nor discriminates invidiously against any individual or group").

Plaintiffs rely on *American Postal Workers Union, Headquarters Local 6885 v. American Postal Workers Union,* 665 F.2d 1096 (D.C.Cir.1981), where the Court found a LMRDA violation when the union denied members of one local the right to ratify their contract while granting this right to members of another local. However, as Local 30 points out, *American Postal Workers Union* differs from the present case because in that case certain members were denied entirely the right to vote on their contract.

Plaintiffs cite *McGinnis v. Local Union 710, International Brotherhood of Teamsters,* 774 F.2d 196 (7th Cir.1985), where the Court held that a union policy requiring members to attend meetings in Chicago in order to vote on amendments to the union constitution and bylaws violated union members' rights to equal voting privileges under Section 101(a)(1), given that a good number of union members lived over 150 miles away from Chicago. The Seventh Circuit concluded that the "in-Chicago voting requirement does impose a very substantial burden on the right to vote of a very significant percentage of the Local 710 membership," *id.* at 201, and the union had not offered sufficient justification for the requirement, *id.* at 202. Plaintiffs rely also on *Bunz v. Moving Picture Machine Operators' Protective Union Local 224,* 567 F.2d 1117 (D.C.Cir.1977), where the D.C. Circuit held that a union violated Section 101(a)(1) when, after a vote had already occurred, the union leadership raised the percentage of votes required to defeat a bylaw amendment from 34 percent to 51 percent. The Court in *Bunz* found that the union had issued a "patently frivolous" interpretation of its constitution when it changed the percentage of votes required. *Id.* at 1122. The Court concluded that "a union cannot immunize itself against charges of discrimination simply by affording each member the 'mere naked right to cast a ballot;' the right each member has to vote must be 'meaningful.'" *Id.* at 1121 (footnotes omitted). Plaintiffs argue that Local 30 has similarly modified the percentage of Senior votes required to

defeat a contract: In the past a majority of Seniors could defeat a contract, but now even if all Seniors voted against it, the contract could still be ratified.

However, the Second Circuit has repeatedly emphasized the narrow scope of Section 101(a)(1), and has rejected the D.C. Circuit's holding in *Bunz* that LMRDA provides the right to a "meaningful" vote. In *Members for a Better Union v. Bevona*, 152 F.3d 58 (2d Cir.1998), the Second Circuit stated that none of the grounds articulated in *Bunz* "induce us to deviate from *Calhoon*'s unequivocal interpretation of § 101(a)(1)." *Id.* at 65. The Court said that a claim under Section 101(a)(1) must "allege the denial of some privilege or right to vote which the union has granted to others." *Id.* A year later, in *Sim v. New York Mailers' Union No. 6*, 166 F.3d 465 (2d Cir.1999), the Second Circuit reiterated its holding *Bevona*. The Court concluded: "Plaintiffs' Second Amended Complaint, while chock full of alleged misconduct by Union officials and Times's foreman, contains no allegation that plaintiffs were the subject of discrimination or were denied a right to vote that the Union granted to other members." *Id.* at 471.

■  Plaintiffs claim that Local 30 purposefully changed the voting procedure in order to ensure that the votes of Seniors, a title with only 65 members, had no effect. This, plaintiffs contend, was discrimination against the Seniors in violation of LMRDA. Plaintiffs distinguish *Black* on the ground that in *Black* there had been a consistent past practice of pooled voting. In *Black* there was no allegation that the voting practice was changed in a specific instance to deny the effectiveness of the votes of a group disadvantaged under the contract.

■  A district court in this Circuit has noted the possible relevance of a showing of a discriminatory motive in adopting a particular voting scheme to whether there has been a Section 101(a) violation. *See Brown v. Sombrotto*, 523 F.Supp. 127, 133 (S.D.N.Y.1981) ("Plaintiffs have not alleged that defendants' method of casting the votes of Branch 36 delegates was a purposeful and deliberate attempt to discriminate against them.... Although it is unclear whether the requirements of willfulness applies to claims of denial of the equal right to vote as well as to claims of infringement of the right to free speech, the absence of a purposeful attempt to suppress dissent in this case lends support to this court's decision to dismiss plaintiff's Title I claims."). However, the Second Circuit has repeatedly cautioned against reading LMRDA to cover any conduct that is not a "direct attack" on the right to vote. Dilution of votes does not constitute a "direct attack" on the right to vote. *See Fritsch*, 493 F.2d at 1063; *Black*, 454 F.Supp. at 822. Although the decision to pool the votes of the titles diminished the power of the Seniors' votes, it did not deny them the right to vote. Each Senior was permitted to vote, and each City member's vote counted the same as any other member's vote. A dilution of a particular group's vote through pooled voting is not sufficiently "direct" an attack on the right to vote to constitute a Section 101(a) LMRDA violation. Indeed, one could argue that the prior arrangement whereby Seniors could prevent adoption of a contract that benefitted the majority of Local 30 members was an attack—"direct" or not—on the voting rights of other members.

Plaintiffs allege in their complaint, as their "Fourth Cause of Action" that "Local 30 has engaged in a series of acts designed to chill dissent and assure that the voices of those who disagree with leadership are either not heard or are rendered ineffec-

tive." (Am.Compl.¶ 22) These steps are said to include, in addition the ratification vote, the following: disciplining Richard Perez for criticizing the union; selecting Ahern and Hach without holding a vacancy election; and removing Local 30's Treasurer and Vice President from their Business Agent positions for failing to support the selection of Ahern. (Am.Compl.¶¶ 22–23) These "undemocratic actions" are alleged to have violated Section 101(a)(1) and 101(a)(2) of LMRDA.

However, plaintiffs set forth no facts regarding Perez, the selection of Ahern, or the removal of the other individuals. Local 30 asserts that these matters have been litigated elsewhere. (Ans.¶ 33) Although plaintiffs have presented evidence relating to the joint ratification vote, this evidence does not support a claim under Section 101(a)(2). Section 101(a)(2) guarantees members "the right to meet and assemble freely ... and to express any views, arguments, or opinions" concerning union policies. 29 U.S.C. § 411(a)(2) (2000). Plaintiffs allege that Local 30 sought to "chill dissent." However, plaintiffs fail to present any evidence that Local 30 interfered with the rights of the Seniors to meet and assemble, or to express their views, and cite no cases to show that Local 30's actions could constitute a Section 101(a)(2) violation.

Therefore, Local 30's motion for summary judgment on both LMRDA claims is granted.

## B. IUOE Constitution

■ Plaintiffs allege that the manner in which the ratification vote was conducted violated the IUOE Constitution. Plaintiffs appear to assert that this cause action arises under Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). (Am. Compl. ¶ 2; ¶ 15)

Section 301(a) provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties....

29 U.S.C. § 185(a). In *United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Industry v. Local 334*, 452 U.S. 615, 101 S.Ct. 2546, 69 L.Ed.2d 280 (1981), the Supreme Court held that a parent union's constitution was a contract between labor organizations within the meaning of Section 301(a), and a federal court had jurisdiction under the section over a suit by a local against its parent international union. In *Wooddell v. International Brotherhood of Electric Workers, Local 71*, 502 U.S. 93, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991), the Court concluded that an individual employee, as a third-party beneficiary of the union's constitution, could sue a local under Section 301(a) alleging a violation of the international union's constitution. *See Wooddell*, 502 U.S. at 101, 112 S.Ct. 494 ("[U]nion constitutions are an important form of contract between labor organizations. Members of a collective-bargaining unit are often the beneficiaries of such interunion contracts, and when they are, they ... may bring suit on these contracts under § 301."); *see also Shea v. McCarthy*, 953 F.2d 29, 31 (2d Cir.1992).

If plaintiffs were private employees, there is no doubt that this court would have subject matter jurisdiction under Section 301(a) to consider the claim that Local 30 violated the IUOE Constitution. However, plaintiffs' employment by the City makes the issue of subject matter jurisdiction more complex.

The National Labor Relations Act's ("NLRA") definitions, *see* 29 U.S.C. § 152, apply to the LMRA, *see* 29 U.S.C. § 142(3); *Ayres v. Int'l Bhd. of Elec. Workers,* 666 F.2d 441, 442–43 (9th Cir. 1982); *Crilly v. S.E. Penn. Transp. Auth.,* 529 F.2d 1355, 1359 (3d Cir.1976). The NLRA's definition of "employer" provides that an employer "shall not include ... any State or political subdivision thereof." 29 U.S.C. § 152(2). An "employee" "shall not include any individual employed ... by any other person who is not an employer as herein defined." 29 U.S.C. § 152(3). The NLRA defines a labor organization as an entity "in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning" employment matters. 29 U.S.C. § 152(5).

Plaintiffs' claim involves an alleged violation of the IUOE constitution—a contract between Local 30 and the IUOE.[1] The parties do not address the potential lack of subject matter jurisdiction over plaintiffs' claim that Local 30 violated the union's constitution. Research has not found any cases addressing whether a public employee can bring a Section 301(a) claim against a local union for violation of the international constitution, when that local union represents both public and private employees.

The similarity between the NLRA definition of "labor organization" and the definition of this term under LMRDA suggests that the reasoning of courts in holding that mixed unions are subject to LMRDA might apply to Section 301(a) claims against such unions. It could be argued that Local 30 is a "labor organiza-

tion" within the meaning of the LMRA, because it deals with private employers in addition to New York City. Similarly, the IUOE deals with private employers. Thus, it could be argued, the IOUE Constitution is a contract within the meaning of Section 301(a), and any union member, public or private, can bring a claim alleging a violation of the Constitution.

However, courts have consistently held that public employees cannot bring claims under NLRA and LMRA provisions. Many cases involving the LMRA's Section 301(a) are so-called "hybrid" claims: the employee sues an employer under Section 301(a) for violating a collective bargaining agreement, and sues a union for breach of the duty of fair representation based on the failure of the union to pursue a grievance on behalf of the employee against the employer. Courts have held that they lack subject matter jurisdiction over hybrid claims by public employees because a public employer is not an "employer" within the meaning of the LMRA. *See, e.g., Moir v. Greater Cleveland Reg'l Transit Auth.,* 895 F.2d 266, 269 (6th Cir.1990); *Manfredi v. Hazleton City Auth.,* 793 F.2d 101 (3d Cir.1986); *Crilly,* 529 F.2d at 1357.

A claim by a public employee against a union for breach of the federal duty of fair representation, with no claim asserted against an employer for breach of a collective bargaining agreement, have also been dismissed. *See Strasburger v. Bd. of Educ., Hardin County Community Unit Sch. Dist. No. 1,* 143 F.3d 351, 360 (7th Cir.1998) (holding that because school board was not an "employer" within the meaning of the LMRA, the plaintiff was

---

1. Plaintiffs fail to allege that the IUOE Constitution is a contract between the International Union and Local 30. Instead, their complaint states: "The Constitution of the IUOE constitutes a contract between Local 30 and its members pursuant to Section 301(a) of the

LMRA." (Am.Compl.¶ 15) However, as the following discussion shows, even if plaintiffs had alleged that the constitution was a contract between two labor organizations, plaintiffs would be unable to assert a 301 claim because they are public employees.

not an "employee," and therefore could not bring a claim under Section 301 against union for breach of the duty of fair representation); *Ayres v. Int'l Bhd. of Elec. Workers*, 666 F.2d 441, 444 (9th Cir.1982) ("We hold that section 301(a) of the Act does not grant this court jurisdiction over the claims of an individual employed by a political subdivision of a state.") (citation omitted); *Muhlrad v. Mitchell*, No. 96 Civ. 3568, 1997 WL 182614, at *3 (S.D.N.Y. Apr.14, 1997) ("An individual who is not employed by an 'employer,' as defined in the NLRA, cannot bring a claim against a union for breach of the duty of fair representation with respect to that employer."); *Tadros v. Public Employees Fed'n*, No. 94 Civ. 6893, 1995 WL 746371, *2 (S.D.N.Y. Dec.15, 1995) (no jurisdiction under Section 301 of LMRA, or 28 U.S.C. § 1337, or § 1331, over claim by public employee against union); *Sampson v. United Fed'n of Teachers*, No. 89 Civ. 5357, 1990 WL 48048, *2 (S.D.N.Y. Apr.10, 1990) (no subject matter jurisdiction under Section 301 of LMRA or 28 U.S.C. § 1337 over duty of fair representation claim against union by public employee).[2]

These rulings that public employees may not sue under NLRA and LMRA supports the view that these laws do not cover public employee claims in the present situation—even though Local 30 represents both public and private employees.

Thus, the claim that defendants have violated the IUOE Constitution is dismissed for lack of subject matter jurisdiction.

## C. Duty of Fair Representation

■ Plaintiffs claim that Local 30, by acting arbitrarily and dishonestly, has violated the duty of fair representation it owes its members under New York law. Plaintiffs' complaint asserts that the manner in which Local 30 conducted the vote "constituted a breach of the Union's duty of fair representation under the common law of the State of New York." (Am. Compl.¶ 1) The complaint, under the "Third Cause of Action," states that "[a]s the exclusive bargaining representative, under the New York City Collective Bargaining Law, for Senior Statutory Engineers employed by New York City, Local 30 owes a duty of fair representation to plaintiffs." (Am.Compl.¶ 20) As this is a state law cause of action, this court could have subject matter jurisdiction over it only through the supplemental jurisdiction statute, *see* 28 U.S.C. § 1367.

---

2. When an employee brings a hybrid claim, suing both the union and the employer, jurisdiction rests on Section 301(a) of the LMRA. However, a federal court has jurisdiction over a suit by an employee brought only against the union for breach of the duty of fair representation. *See Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1145 (2d Cir.1994). The federal duty of fair representation is implied from section 9(a) of the NLRA, which grants unions the exclusive right to bargain for all members of a designated unit. *See Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). When an employee sues only the union, courts have held that subject matter jurisdiction exists under 28 U.S.C. § 1337. *See Kunz v. United Food & Commercial Workers, Local 876*, 5 F.3d 1006, 1010 (6th Cir.1993); *Felice v. Sever*, 985 F.2d 1221, 1225, 1226 (3d Cir.1993). In the *Strasburger* and *Ayres* cases, cited above, plaintiffs sued only the union for breach of the duty of fair representation, and not the employer, but nonetheless relied on Section 301(a) as the basis for jurisdiction over the claims. The courts in these cases held that public employees could not assert such claims against their unions under Section 301(a) because they were not employed by employers covered by LMRA. In *Muhlrad, Tadros*, and *Sampson*, the plaintiffs asserted jurisdiction also under 28 U.S.C. § 1331 and/or § 1337, and the courts found these public employees could not bring federal breach of duty of fair representation claims against their unions.

■ A district court has supplemental jurisdiction over claims "that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Section 1367 permits a district court to decline to exercise supplemental jurisdiction over a claim if the claim raises a novel or complex issue of state law, or after the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(1), (c)(3). In deciding whether or not to exercise supplemental jurisdiction, a court may balance several factors, including considerations of judicial economy, convenience and fairness to the litigants. *See Purgess v. Sharrock,* 33 F.3d 134 (2d Cir.1994); *Castellano v. Board of Trustees,* 937 F.2d 752 (2d Cir. 1991).

The general standard for New York's duty of fair representation is settled under New York case law. However, plaintiffs' claim involves a union's duty in the setting of a contract negotiation and a membership ratification vote, a subject that has not been explored in any depth by New York courts. Furthermore, even if plaintiffs could show that the union engaged in bad faith conduct with regard to the negotiations and vote, there remains a question regarding what kind of causal link must be demonstrated between the union's misconduct and the plaintiffs' injuries. The issue of causation in this context does not appear settled under New York law. For these reasons, which are explained in more detail below, this court declines to exercise supplemental jurisdiction over the claim.

Plaintiffs, as employees of the City of New York, cannot, and do not attempt to, state a claim that Local 30 breached the federal duty of fair representation. The federal duty of fair representation is inferred from Section 9(a) of the NLRA. *See Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct.

903, 17 L.Ed.2d 842 (1967). However, because the state and its political subdivisions are excluded from the definition of "employer" contained in the NLRA, *see* 29 U.S.C. § 152(2), courts have held that a public employee cannot maintain a cause of action against a union for breach of the federal duty of fair representation. *See e.g., Muhlrad v. Mitchell,* No. 96 Civ. 3568, 1997 WL 182614, at *3 (S.D.N.Y. Apr.14, 1997).

Plaintiffs' complaint recognizes that Local 30's duty to them is grounded in state law. New York courts have recognized a duty of fair representation owed by public sector unions. *See Civil Serv. Bar Ass'n, Local 237, Int'l Bhd. of Teamsters v. City of New York,* 64 N.Y.2d 188, 196, 485 N.Y.S.2d 227, 230–31, 474 N.E.2d 587 (1984) ("Although the State and its political subdivisions are excluded from the definition of "employer" contained in subdivision (2) of section 2 of the National Labor Relations Act, the courts in New York have recognized a similar duty of fair representation on the part of public sector unions predicated on their role as exclusive bargaining representatives."); *Baker v. Bd. of Educ. of W. Irondequoit Ctr. Sch. Dist.,* 70 N.Y.2d 314, 320, 520 N.Y.S.2d 538, 541, 514 N.E.2d 1109 (1987) ("The Taylor Law establishes the scheme by which certified unions are recognized as the exclusive bargaining agents for their members. This statutory role is the basis for the implied cause of action in favor of public employees against their unions for breach of the duty to represent all members fairly.") (citations omitted); *see also McGovern v. Local 456, Int'l. Bhd. of Teamsters,* 107 F.Supp.2d 311, 319 (S.D.N.Y.2000) (citing *Civil Serv. Bar Ass'n* ).

■ Although plaintiffs' complaint recognizes that Local 30's duty is grounded in state law, plaintiffs rely exclusively on fed-

eral case law to support their position that Local 30 breached its duty to represent them fairly. New York courts have followed the same general standard as federal courts in weighing claims by public employees alleging breaches of the duty of fair representation. Under federal law, to state a claim against a union for breach of its duty, a plaintiff must allege facts that show either arbitrary, discriminatory or bad faith conduct on the part of the union. *See Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). New York courts have used the same standard in suits by public employees. *See e.g., Ponticello v. County of Suffolk,* 225 A.D.2d 751, 752, 640 N.Y.S.2d 169, 171 (2d Dep't 1996) ("In order to establish a breach of the duty of fair representation, it is necessary to show that the union's conduct was arbitrary, discriminatory, or in bad faith."); *Braatz v. Mathison,* 180 A.D.2d 1007, 1007, 581 N.Y.S.2d 112, 113 (3d Dep't 1992) ("It is well settled that a union breaches its statutory duty of fair representation only when its conduct toward a member is arbitrary, discriminatory or in bad faith."); *see also Martin v. N.Y. State Dept. of Corr. Servs.,* 115 F.Supp.2d 307, 317 (N.D.N.Y.2000) (stating that under New York law plaintiff must show union's conduct was "arbitrary, discriminatory, or in bad faith"); *Black v. Transp. Workers Union,* 454 F.Supp. 813, 825 (S.D.N.Y.1978) (same).

Federal courts have held that a union's duty includes representing its members fairly in negotiating contracts. *See O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127. New York's state law duty appears to extend to contract negotiations as well. *See Civil Serv. Bar Ass'n,* 64 N.Y.2d at 196, 485 N.Y.S.2d 227, 474 N.E.2d 587 (considering plaintiffs' claim that union did not represent them fairly when settling group salary grievance with City); *O'Riordan v. Suffolk Chapter, Local No. 852, Civil Serv.*

*Employees Ass'n,* 89 A.D.2d 558, 558, 452 N.Y.S.2d 114, 115 (2d Dep't 1982) (holding that plaintiffs had standing to bring claim alleging that Civil Service Employees Association breached duty of fair representation in negotiating collective bargaining agreement). However, the vast majority of New York cases addressing the duty of fair representation involve challenges to the handling of member grievances by unions against employers for alleged violations of collective bargaining agreements. The scope of a union's duty during contract negotiations and with regard to membership ratification votes is not well defined in New York cases.

Nonetheless, it is clear under New York law that Local 30's conduct could not be considered "arbitrary," even accepting plaintiffs' view of the facts. That the consent determination benefitted other titles more than Seniors is not a ground for calling Local 30's bargaining conduct arbitrary. Unions can take actions that benefit one group of members more than others. *See Civil Serv. Bar Ass'n,* 64 N.Y.2d at 197, 485 N.Y.S.2d 227, 474 N.E.2d 587 ("Where the union undertakes a good-faith balancing of the divergent interests of its membership and chooses to forgo benefits which may be gained for one class of employees in exchange for benefits to other employees, such accommodation does not, of necessity, violate the union's duty of fair representation.").

However, plaintiffs have demonstrated disputed facts that bear on whether Local 30 engaged in bad faith conduct. Cunningham and Egan said that Ahern told union members that the City required the offer to be voted on collectively by all titles. (Cunningham Aff. ¶ 5; Cunningham Dep. at 127; Egan Dep. at 73) Ahern denies telling union members that the City set the voting procedure, and Pugh supports Ahern's denial. (Ahern Dep. at 93;

Pugh Dep. at 46) The City denies discussing ratification procedures with Local 30, and Local 30 agrees that it was the union's decision to hold the joint vote, not the City's. (City's 56.1 ¶ 6; Ahern Dep. at 93) There are several possible ways to explain the conflicting statements regarding what Ahern told union members: Cunningham and Egan are lying about what Ahern said; Ahern and Pugh are lying about what Ahern said, and the Local 30 leadership intentionally misled the membership; Ahern misspoke, but not did not intentionally mislead; or the plaintiffs simply misunderstood or do not accurately remember Ahern's statements. A jury could credit the testimony of Cunningham and Egan, and infer that Ahern's statement to the members was a dishonest attempt to pass off responsibility for the voting procedure to the City and thus avoid facing further resistance from the Seniors to a joint vote. A finding that Ahern purposefully misled members about who was setting the voting rules might show bad faith conduct under New York law. *See Badman v. Civil Serv. Employees Ass'n,* 91 A.D.2d 858, 858, 458 N.Y.S.2d 385, 386 (4th Dep't 1982) ("To sustain a cause of action for breach of the duty of fair representation there must be substantial evidence of fraud, deceitful action, or dishonest conduct, or evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives.").[3]

However, bad faith conduct alone may not suffice to breach the duty of fair representation. Under Second Circuit decisions construing the federal duty of fair representation, plaintiffs would have to show also that Ahern's statements injured them. *See Spellacy v. Airline Pilots' Ass'n,* 156 F.3d 120, 126 (2d Cir.1998) (holding that plaintiffs must "demonstrate a casual connection between the union's wrongful conduct and their injuries"); *see also Sim,* 166 F.3d at 472 ("[P]laintiffs must demonstrate that any alleged misconduct had an effect on the outcome of the second ratification vote"). It is not clear the extent to which a showing of causation is required under the New York duty. Several cases involving a union's handling of an employee's grievance against an employer suggest such a requirement. *See Neiman v. Kingsborough Community College,* 146 A.D.2d 612, 614, 536 N.Y.S.2d 843, 845 (2d Dep't 1989) ("Even if the PSC breached its duty of fair representation, that violation did not prevent the plaintiff from pursuing the grievance process himself."); *Sinicropi v. N.Y. State Pub. Employment Relations Bd.,* 125 A.D.2d 386, 388–89, 509 N.Y.S.2d 357, 360 (2d Dep't 1986) ("It is obvious that, in order to recover damages from a union pursuant to a cause of action alleging a breach of the duty of fair representation, the employee must prove the merits of the underlying grievance against the employer, the proper prosecution of which the union is alleged, by its misconduct, to have foreclosed.").

Even drawing all inferences in favor of plaintiffs, the question of whether Local 30's conduct caused plaintiffs' injuries would be a close call under federal law.

---

**3.** Courts have found a breach of the federal duty of fair representation when a union leader has purposefully concealed or misrepresented matters in his dealings with members. *See Lewis v. Tuscan Dairy Farms, Inc.,* 25 F.3d 1138, 1142 (2d Cir.1994) ("Whether or not he acted arbitrarily, [the union president] acted in bad faith, in violation of the duty of fair representation, by wilfully concealing the oral agreement from Union members."); *see also Alicea v. Suffield Poultry, Inc.,* 902 F.2d 125, 130 (1st Cir.1990) ("Holding a union responsible for serious misrepresentations that lack rational justification or are improperly motivated is consistent with the union's obligation to deal honestly and fairly with its members.").

To show causation, plaintiffs would have to prove that had Ahern told the members the truth about who made the decision to hold a collective vote, the members would have persuaded Local 30 leadership to hold a separate vote by title, and the contract would not have been ratified.[4] However, even if plaintiffs have demonstrated causation, the link is attenuated, and it may not be sufficient under federal law.

The causation requirement in New York, to the extent it exists, is not well articulated in case law. Because the issue of whether Local 30 breached its duty toward the Seniors appears to rest largely on the issue of causation, this court should decline to exercise supplemental jurisdiction over the claim.

Courts have taken differing views on whether to exercise supplemental jurisdiction over New York duty of fair representation claims. *See Muhlrad v. Mitchell*, No. 96 Civ. 3568, 1997 WL 182614, at *5 (S.D.N.Y. Apr.14, 1997) ("This Court will not . . . retain jurisdiction over plaintiffs' claims under New York State and City labor laws. These claims require interpretation and application of the statutory framework of the New York State and City labor laws, which is intricate. As such, these claims are best resolved in state court."); *El–Bey v. City of New York*, 151 F.Supp.2d 285, 302 (S.D.N.Y.

2001) (declining to exercise supplemental jurisdiction over state law duty of fair representation claim). *But see Martin*, 115 F.Supp.2d at 317 (considering plaintiff's state duty of fair representation claim and finding that plaintiff made out prima facie case against union for breach of duty due to arbitrary conduct); *McGovern*, 107 F.Supp.2d at 319 (granting summary judgment to defendants on plaintiffs' New York duty of fair representation claim); *Black*, 454 F.Supp. at 824 (exercising pendent jurisdiction over New York duty of fair representation claim). In both *McGovern* and *Black*, the courts found that the plaintiffs had not shown bad faith or arbitrary conduct—therefore, those courts did not have to reach issues of causation. The *Martin* Court did not discuss a possible causation requirement.

This case was filed over three years ago, and the parties have expended resources in taking depositions, which may weigh in favor of exercising supplemental jurisdiction here. *See Purgess*, 33 F.3d at 138 (stating that rejection of supplemental jurisdiction after there has been a substantial expenditure of time and effort may be unfair to the litigants). However, time and effort do not weigh heavily here because any discovery already taken would be available to the parties in state court.

---

4. Plaintiffs claim they have satisfied any causation requirement because they have produced evidence that 43 of the 65 Seniors opposed the consent determination. (Pl.'s Mem. at 19 n. 1; Soroka Decl., Ex. N) Thus, they argue, had the Senior title voted individually on the contract, the title would not have ratified it. Plaintiffs do not address, however, the link between Ahern's statements and the collective vote. A causal link could be drawn: Had the members known that their own representatives, rather than the City, decided to conduct a joint ratification vote, they likely would have objected to the change in procedure more strenuously. Under a joint ratification system, every union member's vote be-

comes less effective, regardless of title. Pugh stated that at the initial June 1, 1999 meeting, when the members were informed of the voting procedure, some, including those in titles other than Senior, objected to the change in ratification procedure. (Pugh Dep. at 75) Members may have voted to ratify the City's offer, and not objected more forcefully to the change in the voting procedure, because they were not aware that the City's offer could have been voted on separately by title. How the vote was conducted was solely in the hands of the union's representatives, but if plaintiffs' testimony is taken as true, union members were not aware of this.

Because all federal claims have been dismissed, and because this case appears to involve a novel question under New York law—what causal connection between the union's misconduct and the plaintiff's injuries is required to maintain a breach of the state duty of fair representation—this court declines to exercise supplemental jurisdiction over the claim.

### III.

Plaintiffs have sued also the City defendants. The City defendants renew their motion to dismiss for failure to state a claim, or alternatively seek summary judgment. Plaintiffs have again failed to cite any case or legal authority in which an employer who is simply notified of a claim that a union has failed in its obligation to provide fair representation has been held to incur liability by signing a contract with that union.

Plaintiffs argue there is a material issue of fact regarding whether Local 30 or the City first made the proposal to offer one consent determination, covering all titles. (Pl.'s 56.1 ¶ 5) However, this issue is not material to any claim against the City. Plaintiffs claim also that there is an issue of disputed fact regarding whether the City dictated how the ratification vote would be conducted. (Pl.'s 56.1 ¶ 7) However, the City and Local 30 agree that Local 30 made the decision about how to conduct the vote. The only issue of disputed fact is what Ahern told the members about what the City required—not what the City in fact required. Plaintiffs have offered no evidence that the City participated in any way in misleading them.

Finally, because all of plaintiffs' claims against Local 30 have been dismissed, the City defendants are no longer necessary parties to the relief plaintiffs requested. Therefore, the claims against the City defendants are dismissed.

\* \* \* \* \* \*

For the reasons stated above, Local 30's motion for summary judgment is granted with respect to the LMRDA claim. The IUOE Constitution claim is dismissed for lack of subject matter jurisdiction and this court declines to exercise supplemental jurisdiction over the state law duty of fair representation claim. The City defendants' motion to dismiss is granted.